[No. 57011-1-I.    Division One.    January 29, 2007.]

VERNON BRAATEN, *Appellant*, v. SABERHAGEN HOLDINGS ET AL., *Respondents*.

---

34

*Matthew P. Bergman, David S. Frockt, Ari Y. Brown, Brian F. Ladenburg,* and *Glenn S. Draper* (of *Bergman & Frockt, PS*) and *LeAnn McDonald* (*Ladd R. Gibke* and *Charles S. Siegel* of *Waters & Kraus, LLP*, of counsel), for appellant.

*Barry N. Mesher, Brian D. Zeringer, Michael B. King,* and *Brett N. Anderson* (of *Lane Powell, PC*) (*Robert L. Byer* and *Nicholas P. Vari* of *Kirkpatrick Lockhart Nicholson Graham*, of counsel), for respondents Buffalo Pumps, Inc., and Crane Co.

*Kenneth E. Petty* and *Margaret A. Sundberg* (of *Williams, Kastner & Gibbs, PLLC*), for respondent General Electric Co.

*James E. Horne, Michael E. Ricketts,* and *Robert H. Fulton* (of *Kingman Peabody Fitzharris & Ringer, PS*), for respondent IMO Industries, Inc.

*Katherine M. Steele, J. William Ashbaugh,* and *Karen L. Cobb* (of *Stafford Frey Cooper*), for respondent Yarway Corp.

*Mark V. Tuvim* on behalf of Ingersoll Rand Co. and Leslie Controls, amici curiae.

¶1 BAKER, J. — Vernon Braaten spent his career as a pipe fitter at the Puget Sound Naval Shipyard, where he was often exposed to asbestos. His job involved tearing into, removing, and replacing asbestos insulation used in and on the pumps, valves, and turbines he maintained. He sued the machine manufacturers, claiming that they should have warned about the danger of asbestos inhalation involved with using their products. Braaten first sued in Texas state court where, two weeks before trial, the court entered summary judgment in favor of one of the defendants. Braaten took a nonsuit against the remaining defendants and sued in Washington.

¶2 The Washington case raised the same issue with respect to all five manufacturers, and all five won their summary judgment motions. Braaten appealed. General Electric (GE) argued on appeal that collateral estoppel precludes Braaten's claim; the other manufacturers responded only on the merits. We affirm summary judgment for GE on the alternate ground of collateral estoppel. We hold that the other four manufacturers did have a duty to warn and reverse and remand for further proceedings.

I

¶3 Vernon Braaten worked for 35 years as a pipe fitter at the Puget Sound Naval Shipyard. His job was to maintain ship valves, pumps, and turbines, some of which were manufactured by Crane Co. (valves), GE (turbines), IMO Industries, Inc. (pumps),[1] Yarway Corporation (valves), and Buffalo Pumps, Inc. (pumps). Regular maintenance of all these machines required the removal of exterior asbestos mud insulation that had to be sawn or hammered off. Regular maintenance of the valves and pumps also required replacement of interior asbestos gaskets and packing, which usually had to be ground, scraped, or chipped off. Braaten could not service the valves, pumps, and turbines without disturbing the asbestos.

---

[1] IMO is the successor in interest to DeLaval Turbine, Inc.

¶4 The use of asbestos in and on Navy valves, pumps, and turbines was not by chance, but by design. GE's medical and Navy expert Lawrence Betts declared that the use of asbestos was "based on military necessity." Asbestos insulated the valves, turbines, fittings, and flanges on almost all combat vessels built between World War I and the mid-1980s because it was lighter and withstood higher temperatures than other products.

¶5 All five manufacturers either sold products containing asbestos gaskets and packing or were aware that asbestos insulation was regularly used in and around their machines when they were installed on a Navy ship. Buffalo Pumps sold pumps with asbestos packing and gaskets for use in Navy ships from 1943 to 1989. Crane's bronze, iron, and steel valves all included asbestos packing and gaskets; asbestos sheet packing was described in the Crane catalog as "superior." Yarway acknowledged that asbestos was the "only insulation product available to withstand temperature" on Navy ships. Although some of their machines could operate using no insulation or nonasbestos insulation, it was highly likely that a valve, pump, or turbine sold to the Navy would contain or be used in conjunction with asbestos.

¶6 During the maintenance process, asbestos dust was released into the air and Braaten breathed it in. Until 1980, he wore no breathing protection. Then, he was told to wear a paper dust mask. No one in his division wore respirators until the mid-1980s. In 2003, Braaten was diagnosed with mesothelioma, a disease caused by his inhalation of asbestos dust.

¶7 Braaten sued 30 machine manufacturers in Texas, alleging strict liability and negligence for failure to warn of the dangers of exposure to asbestos. One manufacturer, Goulds Pumps,[2] filed a no evidence motion. The motion maintained there was no evidence that Goulds had a legal duty to Braaten. The Texas court agreed. Braaten quickly

---

[2] Goulds is not a party to this appeal.

took a nonsuit against the remaining parties and filed a new suit here in Washington state. He did not appeal the Texas order.

¶8 The court below granted summary judgment to all defendants, ruling that these manufacturers had no duty to warn about asbestos products manufactured and installed by others. GE argued that the Texas summary judgment order collaterally estopped Braaten's Washington claims, but the trial court concluded that it did not. Braaten appealed.

## II

¶9 When reviewing a summary judgment motion and order, we engage in the same inquiry as the trial court.[3] We consider the facts in the light most favorable to the nonmoving party. Summary judgment is appropriate if the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.[4]

### Collateral Estoppel

¶10 GE argues that collateral estoppel bars relitigation of the duty to warn issue. The doctrine of collateral estoppel promotes finality and judicial economy by preventing parties from raising identical issues after they receive a full and fair opportunity to present their claims.[5] The doctrine applies if: (1) the issue raised is identical to the issue previously ruled upon; (2) the prior adjudication ended in a final judgment on the merits of the issue; (3) the party against whom collateral estoppel is asserted was a party, or was in privity with a party, in the prior adjudication; and (4) application of the doctrine does

---

[3] *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

[4] CR 56(c).

[5] *Hanson v. City of Snohomish*, 121 Wn.2d 552, 561, 852 P.2d 295 (1993).

not work an injustice.[6] Injustice in the collateral estoppel context does not refer to a substantive injustice, but to whether the party was afforded a full and fair hearing.[7] Even if the prior legal conclusion was erroneous, collateral estoppel does not work an injustice if the party had the opportunity to attack the error directly.[8]

■ ¶11 Collateral estoppel precludes relitigation of the duty to warn issue against GE. The legal issue is identical between Goulds and GE; it is irrelevant that the two manufacturers produced different products because both products were to be installed on Navy ships and used with asbestos. The Texas summary judgment was a final adjudication on the merits, with the same preclusive effect as a full trial.[9] It is immaterial that GE is a different defendant. Finally, Braaten does not dispute GE's contention that, procedurally, he had an opportunity to challenge the Texas ruling but declined to do so.

■ ■ ¶12 Although the trial court concluded that collateral estoppel did not bar the claims, this court can affirm on alternate grounds as long as those grounds were properly presented and developed below.[10] They were, and summary judgment in favor of GE is affirmed.

Strict Liability—Duty To Warn

■ ¶13 Although this claim would normally be governed by the Washington products liability act (WPLA),[11] Braaten was exposed to asbestos before its adoption, so WPLA does not apply.[12] Therefore, the common law as

---

[6] *Hanson*, 121 Wn.2d at 562.

[7] *Lee v. Ferryman*, 88 Wn. App. 613, 625, 945 P.2d 1159 (1997).

[8] *Thompson v. Dep't of Licensing*, 138 Wn.2d 783, 799-800, 982 P.2d 601 (1999).

[9] *DeYoung v. Cenex Ltd.*, 100 Wn. App. 885, 892, 1 P.3d 587 (2000).

[10] *State v. Sondergaard*, 86 Wn. App. 656, 657-58, 938 P.2d 351 (1997).

[11] Ch. 7.72 RCW. WPLA was adopted in 1981 as part of the tort reform act. *Brewer v. Fibreboard Corp.*, 127 Wn.2d 512, 520, 901 P.2d 297 (1995).

[12] *Koker v. Armstrong Cork, Inc.*, 60 Wn. App. 466, 472, 804 P.2d 659 (1991).

articulated in *Restatement (Second) of Torts* section 402A (1965) controls:

> Special Liability of Seller of Product for Physical Harm to User or Consumer
>
> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>
> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.[13]

Under section 402A, manufacturers are strictly liable for failing to give adequate warnings.[14] The duty extends to foreseeable users of the manufacturer's product.[15] Braaten was a foreseeable user of the products sold by the manufacturers because he performed maintenance work on the products.[16] As a user of the manufacturers' products, Braaten must make a prima facie showing of the following elements to sustain his strict liability claim:

> (1) that there was a defect in the product which existed when it left the manufacturer's hands; (2) that the defect was not known to the user; (3) that the defect rendered the product

---

[13] RESTATEMENT (SECOND) OF TORTS § 402A (1965).

[14] *Van Hout v. Celotex Corp.*, 121 Wn.2d 697, 704, 853 P.2d 908 (1993).

[15] *Lunsford v. Saberhagen Holdings, Inc.*, 125 Wn. App. 784, 793, 106 P.3d 808 (2005). It is important to distinguish foreseeability of who will use the product from foreseeability of the harm. Foreseeability of the harm is *not* an element of a strict liability failure to warn claim. *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wn.2d 747, 762-63, 818 P.2d 1337 (1991). Foreseeability of the harm is relevant to Braaten's negligence claim, but not to his strict liability claim.

[16] *See* RESTATEMENT (SECOND) OF TORTS § 402A cmt. *l* (1965).

unreasonably dangerous; and (4) that the defect was the proximate cause of the injury.[17]

A faultless product may be nonetheless "defective" if it is unreasonably dangerous when placed in the hands of the end user "without giving adequate warnings concerning the manner in which to safely use it."[18] Unlike in a negligence claim, the focus here is on the product and its dangers, not on what the manufacturer knew or should have known.

¶14 Braaten argues that the valves and pumps were defective because there were no warnings about how to safely avoid asbestos exposure during their maintenance. This is an issue of first impression in Washington. The parties cite extensively to other asbestos cases, but none is dispositive. *Lindstrom v. A-C Product Liability Trust,*[19] cited by the manufacturers, has facts identical to this case.[20] However, the issue in *Lindstrom* was causation, not duty.[21] *Olivo v. Owens-Illinois, Inc.,*[22] cited by Braaten, also has similar facts, but the defendant was a landowner, not a machine manufacturer.[23] *Chicano v. General Electric Co.*[24] is almost identical to this case and denies summary judgment, but it is an unpublished decision, and it applies a different test.[25] *Berkowitz v. AC&S, Inc.,*[26] also favors

---

[17] *Novak v. Piggly Wiggly Puget Sound Co.,* 22 Wn. App. 407, 410, 591 P.2d 791 (1979).

[18] *Novak,* 22 Wn. App. at 412.

[19] 424 F.3d 488 (6th Cir. 2005).

[20] *Lindstrom,* 424 F.3d at 491.

[21] *Lindstrom,* 424 F.3d at 492-93. It is worth noting that although duty is not mentioned, as a matter of law the Lindstrom case would not have reached the causation issue without a presumption of duty.

[22] 186 N.J. 394, 895 A.2d 1143 (2006).

[23] *Olivo,* 895 A.2d at 1146.

[24] 2004 U.S. Dist. LEXIS 20330 (E.D. Pa. 2004).

[25] 2004 U.S. Dist. LEXIS 20330, at *40. *Chicano*'s in-depth analysis of the duty to warn issue applies Pennsylvania's component manufacturer liability test, which is not applicable in Washington.

[26] 288 A.D.2d 148, 733 N.Y.S.2d 410 (2001).

Braaten's argument but simply affirms denial of a summary judgment motion with almost no analysis.[27]

¶15 The case of *Teagle v. Fischer & Porter Co.*[28] is of some aid to our duty analysis. In *Teagle*, a manufacturer sold a device called a "flowrator" to Teagle's employer.[29] The flowrator measured liquid chemicals, including ammonia, and was designed to hold chemicals pressurized up to 440 pounds per square inch (p.s.i.).[30] The ammonia would enter the flowrator from one end, Teagle would check a glass tube on the flowrator to see how much ammonia was inside and then he would release it from the other end of the flowrator.[31] To seal the ends of the glass tube, Teagle's employer used rings manufactured by a third party and made of a material called "Viton." The defendant manufacturer knew that Viton was not compatible with ammonia and might disintegrate, causing the glass tube to break.[32] It also knew that if the flowrator broke while holding chemicals pressurized above 50 p.s.i., the operator could be harmed.[33] Teagle was measuring ammonia pressurized at 175 p.s.i. when the rings failed, the glass tube broke, and ammonia sprayed in his eyes.[34] Despite the fact that the use of Viton rings and ammonia in the flowrator was entirely the choice of Teagle's employer, the court held the flowrator manufacturer liable for not warning that the use of those products in conjunction with the flowrator made it dangerous.[35] Without proper warnings, the product was defective when used as intended, regardless of the fact that a third-party's product used in conjunction with the

[27] *Berkowitz*, 288 A.D.2d at 149.

[28] 89 Wn.2d 149, 570 P.2d 438 (1977).

[29] *Teagle*, 89 Wn.2d at 150-51.

[30] *Teagle*, 89 Wn.2d at 151-52.

[31] *Teagle*, 89 Wn.2d at 150-51.

[32] *Teagle*, 89 Wn.2d at 153-54.

[33] *Teagle*, 89 Wn.2d at 151-52.

[34] *Teagle*, 89 Wn.2d at 151-52.

[35] *Teagle*, 89 Wn.2d at 156-57.

flowrator was the precipitating cause of the malfunction and resulting injury.[36]

¶16 However, there is an important factual distinction between *Teagle* and the present case. In *Teagle*, there was an actual failure of the manufacturer's product: the flowrator exploded. Here, there is no allegation that the pumps or valves failed. For that matter, there is no allegation that the asbestos "failed." Products containing hazardous, injury-causing substances that can be released during normal use are unlike traditional defective products. There is nothing "wrong" with such products; they do not "malfunction." They are simply dangerous in ordinary use. This case involves the release of a hazardous substance from a product. In that way, it is more analogous to products liability cases involving gasoline or other hazardous substances.

¶17 One such case from the Fifth Circuit provides an interesting comparison. In *Stapleton v. Kawasaki Heavy Industries, Ltd.*,[37] a motorcycle was tipped over when its fuel switch was in the "on" position. Gasoline leaked out and was ignited by a nearby pilot light. Stapleton sued Kawasaki, alleging negligence, strict liability, and breach of duty to warn about the fuel switch.[38] Although the jurors found that there was no design defect, they did find that Kawasaki breached its duty to warn about the specific danger of gasoline leaking from the motorcycle when the fuel switch was in the "on" position.[39] Kawasaki appealed, raising the issue that the jurors' conclusions were inconsistent with each other.[40] But the Fifth Circuit affirmed, finding no contradiction in the jury's conclusions:

> The jury . . . could have meant that the motorcycle was not defective in the sense that there was something wrong with it

---

[36] *Teagle*, 89 Wn.2d at 155.

[37] 608 F.2d 571 (5th Cir. 1979).

[38] *Stapleton*, 608 F.2d at 572.

[39] *Stapleton*, 608 F.2d at 572.

[40] *Stapleton*, 608 F.2d at 572.

that caused it to be unfit or unsuited for the purpose intended, but that the defendants should have made greater efforts to warn users of the potential danger in failing to turn the fuel switch to the off position. This failure to warn is sufficient to hold Kawasaki liable under both negligence and strict liability theories.[41]

There is an important parallel with this case: the product at issue was dangerous not because it failed or malfunctioned, but because: (1) *by design* it contained a hazardous substance, (2) that hazardous substance was released from the product during normal use,[42] and (3) the manufacturers did not warn users about that danger.

¶18 From a public policy standpoint, asbestos cases are different from gasoline or other hazardous substance cases because asbestos injuries are latent. If there is a gasoline explosion, the injuries are immediately actionable. If there are additional tortfeasors to be impleaded, or against whom indemnity can be sought, they can be ascertained and held liable. In modern asbestos litigation, the manufacturers of the hazardous substance are, for the most part, no longer amenable to judgment.[43] And there is no doubt that asbestos manufacturers are culpable for the injuries to Braaten.

¶19 But the *Stapleton* case does demonstrate that there is an independent duty to warn when a manufacturer's product design utilizes a hazardous substance that can be released during normal use. Few would argue that Kawasaki had no duty to warn about gasoline leaking from its motorcycles simply because someone else manufactured the gasoline. Its product contained gasoline during normal use. Here, the pumps and valves, as designed, contained asbestos during normal use. Also, the hazardous

---

[41] *Stapleton*, 608 F.2d at 572.

[42] The *Stapleton* decision does not explain why a fuel switch allows gas leakage when open, but it appears from the jury's findings that the feature was not considered a defect.

[43] Katherine M. Anand, *Demanding Due Process: The Constitutionality of the § 524 Channeling Injunction and Trust Mechanisms that Effectively Discharge Asbestos Claims in Chapter 11 Reorganization*, 80 Notre Dame L. Rev. 1187, 1190 (2005) ("[M]ost of the asbestos manufacturers responsible are already bankrupt.").

substance was released into the air as part of the regular operation and maintenance of pumps and valves, rather than by accident as in *Stapleton*. This distinction strengthens the argument for a duty to warn in the present case.

¶20 Public policy also supports a finding of duty. In *Lunsford v. Saberhagen Holdings, Inc.*,[44] we recently expanded the definition of "user" of an asbestos product to include the family member of a worker who was exposed to the fibers on that worker's clothing. In doing so, we acknowledged the public policy purpose behind strict liability:

> "On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper person to afford it are those who market the products."[45]

These manufacturers did profit from the Navy's purchase of their products. They argue that they did not sell the specific asbestos that injured Braaten, but that is akin to saying that Kawasaki was not the relevant product seller because it did not sell the gasoline that leaked and ultimately injured Stapleton. Again, when a product's design utilizes a hazardous substance and there is a danger of that substance being released from the product during normal use, the seller of the product containing the substance has an independent duty to warn.

---

[44] 125 Wn. App. 784, 106 P.3d 808 (2005).

[45] *Lunsford*, 125 Wn. App. at 792-93 (quoting RESTATEMENT (SECOND) OF TORTS § 402A cmt. *c*).

¶21 A jury could determine that the pumps and valves were unreasonably dangerous when used as intended, without warnings about how to safely avoid asbestos exposure. Whether the product is unreasonably dangerous is based on the reasonable expectations of the ordinary consumer. Factors to be considered include the relative cost of the product, the gravity of the potential harm, and the cost and feasibility of eliminating or minimizing the risk.[46] Given the high cost of this complex machinery, the deadly medical consequences of prolonged asbestos exposure, and the relatively low cost of adding warnings to a technician's manual or to the exterior of the machinery itself, it appears that a jury could find that the products in this case were unreasonably dangerous.[47]

¶22 If the pumps and valves were found to be unreasonably dangerous without warnings, they would be defective under products liability law: "If a product is unreasonably dangerous, it is necessarily defective."[48] The manufacturers had a duty to warn regarding the safe use of their products, and the trial court erred in concluding otherwise.

Negligence—Duty To Warn

¶23 Braaten also argues that the failure to warn was negligent. The elements of negligence are duty, breach, causation, and damages.[49] In this appeal, duty is the only element at issue. Braaten must show that the manufacturers had a duty to warn of "the hazards involved in the use of the product which are known, or in the exercise of reasonable care should have been known, to the manu-

---

[46] *Bich v. Gen. Elec. Co.*, 27 Wn. App. 25, 32, 614 P.2d 1323 (1980) (quoting *Seattle-First Nat'l Bank v. Tabert*, 86 Wn.2d 145, 154, 542 P.2d 774 (1975)).

[47] Although the issue of unreasonable danger is not discussed in the briefs, the manufacturers would no doubt argue that the asbestos, not their products, posed the danger. However, as discussed below, the pumps and valves are the correct products for this analysis.

[48] *Seattle-First Nat'l Bank*, 86 Wn.2d at 154.

[49] *Koker*, 60 Wn. App. at 473.

facturer."[50] The duty to warn in the context of negligence is similar to the duty to warn in a strict liability claim, but the focus is on the conduct and knowledge of the manufacturer instead of the dangerous propensities of the product itself.[51]

¶24 The manufacturers had a general duty to warn Braaten because he was a user of their valves and pumps.[52] The manufacturers argue that foreseeability is the only possible source of any duty to Braaten and that foreseeability alone is not enough reason to hold them responsible. We disagree. A worker required to frequently service these products as a regular part of his job was a user of their products.

¶25 But as all parties and amici agree, this general duty is bounded by the foreseeability of the harm.[53] The test of foreseeability is " 'whether the actual harm fell within a general field of danger which should have been anticipated.' "[54] In hindsight, asbestos exposure was undoubtedly a hazard involved in the use of the manufacturers' products. But foreseeability of harm examines foresight, not hindsight: did the manufacturers know, or should they have known, about the hazards of asbestos involved in the use of their products at the time they were being sold and used? This question is not an appropriate one for summary judgment. Foreseeability of harm is generally a question of fact for the jury, not a question of law for the court, unless the circumstances of the injury " 'are so highly extraordinary or improbable as to be wholly beyond the range of expectability.' "[55] That is not the situation here. Foreseeability of the harm should be considered by the trier of fact.

---

[50] *Novak*, 22 Wn. App. at 412.

[51] *Little v. PPG Indus., Inc.*, 92 Wn.2d 118, 120, 594 P.2d 911 (1979).

[52] RESTATEMENT (SECOND) OF TORTS § 402A cmt. *l.*

[53] *See Lunsford*, 125 Wn. App. at 793.

[54] *Koker*, 60 Wn. App. at 480 (quoting *McLeod v. Grant County Sch. Dist. No. 128*, 42 Wn.2d 316, 321, 255 P.2d 360 (1953)).

[55] *Seeberger v. Burlington N. R.R.*, 138 Wn.2d 815, 823, 982 P.2d 1149 (1999) (quoting *McLeod*, 42 Wn.2d at 323).

¶26 As a matter of policy, it is logical and sensible to place some duty to warn on the manufacturer, who is in the best position to foresee the specific danger involved in the use of a product. Here, the asbestos manufacturers had a duty to warn about the general dangers of inhaling asbestos fibers, but the manufacturers of the pumps, turbines, and valves also had a duty to warn about maintenance procedures for their products that would release those dangerous fibers into the air.

¶27 The record supports a duty to warn sufficient to survive summary judgment. A trier of fact could conclude that the manufacturers knew or should have known that exposure to released asbestos fibers was a hazard involved in the use of their products. Contrary to the manufacturers' framing of the issue, their duty was not to warn of dangers associated with a third party's product, but of dangerous aspects of their own product: namely, that using their products as intended would very likely result in asbestos exposure. The trial court erred in granting summary judgment for the manufacturers on the duty to warn element of the negligence claim.

III

¶28 GE prevails in its collateral estoppel argument, and summary judgment is affirmed on that alternate basis. The trial court erred when it concluded that the other manufacturers had no duty to warn in strict liability and in negligence. The remaining summary judgment orders are reversed and remanded for further proceedings.

¶29 Affirmed in part and reversed in part.

APPELWICK, C.J., and COLEMAN, J., concur.

Motions for reconsideration denied March 30, 2007.

Review granted at 162 Wn.2d 1011 (2008).