[Nos. A116816, A117648. First Dist., Div. Five. Feb. 25, 2009.]

VICKIE L. TAYLOR, Plaintiff and Appellant, v.
ELLIOTT TURBOMACHINERY CO. INC., Defendant and Respondent.

VICKIE L. TAYLOR, Plaintiff and Appellant, v.
CRANE COMPANY et al., Defendants and Respondents.

■■■■■■■■■■■

## COUNSEL

Waters & Kraus, Paul C. Cook and Michael B. Gurien for Plaintiff and Appellant.

Kirkpatrick & Lockhart Preston Gates Ellis and Raymond L. Gill for Defendant and Respondent Crane Company.

Debevoise & Plimpton, Roger E. Podesta; Gordon & Rees, Michael Pietrykowski and Don Willenburg for Defendant and Respondent Ingersoll Rand Company.

Imai, Tadlock, Keeney & Cordery, Robert C. Keeney and Jaime A. Roder for Defendant and Respondent Elliott Turbomachinery Co., Inc.

Howard Rome Martin & Ridley, Henry D. Rome, Bobbie R. Bailey and Edward C. Hsu for Defendant and Respondent IMO Industries, Inc.

Gordon & Rees, Michael Pietrykowski, Don Willenburg; Munger, Tolles & Olson, Mark H. Epstein, Paul J. Watford and Gabriel P. Sanchez for Defendant and Respondent Leslie Controls, Inc.

---

## OPINION

**DONDERO, J.**[*]—In this appeal, Vickie L. Taylor (Mrs. Taylor) challenges the trial court's grant of summary judgment to respondents.[1] The case arises out of injuries allegedly suffered by her late husband, Reginald (Mr. Taylor), from exposure to asbestos-containing products during his Navy service aboard the USS Hornet in the mid-1960's. During World War II, when the Hornet was originally commissioned, respondents supplied the Navy with various pieces of equipment that were used in the ship's propulsion system, and some of this equipment included asbestos-containing parts.[2] The

---

[*]Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] Respondents in this appeal are Crane Company (Crane), Elliott Turbomachinery Company Inc. (Elliott), IMO Industries, Inc. (IMO), Ingersoll-Rand Company (Ingersoll-Rand), and Leslie Controls, Inc. (Leslie). IMO was sued both individually and as successor in interest to DeLaval Turbine, Inc. (DeLaval), and Warren Pumps, Inc.

[2] Specifically, Crane and Leslie manufactured metal valves used as components of the ship's propulsion system. These valves were shipped to the Navy with asbestos-containing gaskets, packing, and whistles. Ingersoll-Rand supplied various pumps that were installed in the Hornet's aft engine room. Plaintiffs submitted drawings of these pumps that indicated they used asbestos-containing gaskets, although there was no evidence these materials were manufactured or supplied by Ingersoll-Rand. Elliott is alleged to have supplied two deaerating

asbestos-containing parts to which Mr. Taylor was exposed during his service, however, were not manufactured or supplied by respondents but instead by third parties. Plaintiffs sought damages from respondents, alleging that the latter had breached their duty to warn Mr. Taylor of the risks inherent in the asbestos-containing materials supplied by other manufacturers. The trial court granted summary judgment to respondents Crane, IMO, Ingersoll-Rand, and Leslie on the ground that, under California law, a manufacturer's duty to warn extends only to the manufacturer's own products. Elliott was granted summary judgment when the trial court held that plaintiffs had not produced sufficient evidence of causation.

We hold that the trial court was correct in concluding that California law imposed no duty on respondents to warn of the hazards inherent in defective products manufactured or supplied by third parties. Accordingly, we will affirm the judgments.

### FACTUAL AND PROCEDURAL BACKGROUND

During the early 1940's, the five respondents in this appeal supplied various pieces of equipment to the United States Navy for use in the propulsion system of the USS Hornet, a steam-driven aircraft carrier originally commissioned in 1943. The equipment included various valves and pumps, and DFT's. When they were originally delivered to the Navy in the early 1940's, respondents' products incorporated asbestos-containing packing, gaskets, and in some cases, discs or insulation. Significantly, the asbestos-containing gaskets and packing were made by manufacturers other than respondents.

Mr. Taylor joined the United States Navy on July 13, 1964. After boot camp, he was assigned to serve aboard the Hornet. Mr. Taylor served on the Hornet for over three years as a fireman apprentice, fireman, and machinist mate. By the time Mr. Taylor boarded the Hornet, the ship had undergone extensive repairs or overhauls at least three times since it was commissioned.

During his service on the Hornet, Mr. Taylor was assigned to the aft engine room, and his duties included repairing and maintaining machinery in that location. According to his deposition testimony, he was required to remove and replace asbestos-containing internal gaskets, flange gaskets, packing, and blanket insulation from valves and pumps manufactured by respondents.

feed tanks (DFT's). According to plaintiffs' naval expert, these tanks would have required asbestos insulation, gaskets, and packing. IMO's predecessor DeLaval supplied fuel oil booster pumps, transfer pumps, and a shaft-driven lube oil pump. Although these pumps may have been shipped to the Navy with asbestos-containing flange gaskets, those gaskets were not provided by IMO.

Mr. Taylor testified that he would remove the old gaskets by scraping them off with a putty knife, a wire brush, or a sharp piece of metal.[3] The scraping released dust and particles into the air. There were no windows in the aft engine room because it was located below the ship's water line, and Mr. Taylor testified that he inhaled the dust created by removal of the gaskets.

Although it is undisputed that Mr. Taylor was exposed to asbestos-containing materials aboard ship, plaintiffs' naval expert testified that by the time Mr. Taylor served aboard the Hornet, all of the original asbestos-containing parts of respondents' equipment would have been removed. In addition, Mr. Taylor admitted he did not know what entity may have manufactured or supplied the asbestos-containing products with which he worked.

Mr. Taylor was diagnosed with mesothelioma in December 2004. Plaintiffs filed this action against respondents and a number of other entities on February 8, 2005. The complaint alleged causes of action for negligence, strict liability, false representation, intentional tort/intentional failure to warn, and loss of consortium,[4] all of which were predicated on Mr. Taylor's exposure to asbestos-containing products. Following discovery, respondents moved for summary judgment. All respondents, save Elliott, contended that they were not liable to plaintiffs because they did not manufacture or supply the asbestos-containing materials to which Mr. Taylor had been exposed during his military service. For its part, Elliott argued that plaintiffs could not establish the element of causation, because they had produced no evidence of Mr. Taylor's exposure to asbestos from any Elliott product.

In opposing the motions for summary judgment filed by Crane, IMO, Ingersoll-Rand, and Leslie, plaintiffs made no claim that they possessed evidence that (1) Mr. Taylor had been exposed to the original asbestos-containing materials respondents included when they delivered their equipment to the Navy, or (2) respondents had supplied the materials to which he was exposed. Instead, plaintiffs argued only that respondents remained liable for "foreseeable uses of the [respondents'] product, including any foreseeable changes." Plaintiffs argument was therefore essentially a legal one—that a "manufacturer has a duty to warn of hazards arising from the foreseeable uses of its product, even if that hazard arises from the addition of a product that, although manufactured by another, is used in the normal and intended

---

[3] With regard to Elliott, Mr. Taylor testified in deposition that he had never heard of the company, did not associate any products with the Elliott name, and had no information about whether he had ever been exposed to asbestos from an Elliott product. Even after DFT's were described to him, Mr. Taylor could not recall seeing such a product aboard the Hornet.

[4] The only causes of action at issue in this appeal are those alleging failure to warn, under both strict liability and negligence.

operation of the defendant's product." Thus, plaintiffs asserted that so long as the use of the replacement items supplied by other manufacturers was part of the "foreseeable and intended use" of respondents' products, respondents were under a duty to warn even though they had not themselves manufactured or supplied the products that actually caused the injuries.

Plaintiffs opposed Elliott's motion for summary judgment on the basis of Mr. Taylor's deposition testimony that he had "worked on everything that was in the aft engine room" and the declaration of their naval expert. In his declaration, plaintiffs' expert stated that based on his review of Navy documents and his personal inspection of the Hornet, the DFT's aboard the ship were manufactured by Elliott. He further stated that the DFT's were insulated with asbestos during Mr. Taylor's service. Plaintiffs' expert also opined that during the time Mr. Taylor was aboard the Hornet, routine maintenance would have been performed on the DFT's approximately every 2,000 hours of operation, and that such maintenance would have disturbed asbestos-containing materials on the DFT's. Plaintiffs presented no evidence that this maintenance had ever been performed by Mr. Taylor himself or that he had been present when it was done.

The trial court heard argument on the motions in July 2006. With respect to respondents Crane, IMO, Ingersoll-Rand, and Leslie, the trial court ruled that summary judgment was proper based on its view that under California law manufacturers have no duty to warn, under either a strict liability or negligence theory, for products manufactured or supplied by third parties. The trial court granted Elliott's motion for summary judgment on the ground that plaintiffs could not establish causation because they had failed to produce evidence that Mr. Taylor had ever worked on any Elliott product or had been exposed to asbestos from any such product.[5]

---

[5] As will be clear from the discussion below, our holding on the duty to warn issue makes it unnecessary for us to address Elliott's separate arguments regarding plaintiffs' failure to establish that Mr. Taylor was ever exposed to asbestos from any Elliott product. We may affirm the trial court's ruling on any ground supported by the record. (See, e.g., *Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 140 [29 Cal.Rptr.3d 553].) Even if such exposure could be established, plaintiffs' naval expert declared that any original gaskets, packing, and insulation would have been removed by the time Mr. Taylor boarded the Hornet. Thus, Mr. Taylor would not have been exposed to asbestos-containing products supplied by Elliott. This would seem particularly true of any asbestos-containing products in the DFT's, as plaintiffs' expert testified that they would have undergone maintenance every 2,000 hours. The expert also stated that "these wear items (gaskets and packing) would be replaced on many occasions over the life of the tank."

Because we have no need to address Elliott's separate arguments in support of affirmance, we deny as moot Elliott's request for judicial notice. (See Evid. Code, §§ 452, subd. (e)(1), 459, subd. (a).)

Mr. Taylor died on August 28, 2006. Mrs. Taylor filed timely notices of appeal on her own behalf and as her deceased husband's successor in interest.

## DISCUSSION

Mrs. Taylor contends that she may recover under both strict liability and negligence theories of liability. As to the former theory, she contends that respondents owed a duty to warn of the dangers inherent in the asbestos-containing gaskets, packing, discs, and insulation that were used in conjunction with their products, even if respondents did not themselves produce or supply the injury-causing materials. Her negligence theory is that respondents breached their duty of care to Mr. Taylor by failing to warn of the risks posed by the asbestos-containing materials that were used in combination with their equipment. We will therefore examine whether respondents owed a duty to warn under either strict liability or negligence. (See *Milwaukee Electric Tool Corp. v. Superior Court* (1993) 15 Cal.App.4th 547, 559 [19 Cal.Rptr.2d 24] [explaining that both strict liability and negligence theories of products liability involve questions of duty].) We discuss first the principles that govern our review of the trial court's rulings.

### I. *Standard of Review*

We review the trial court's grant of summary judgment de novo, applying the same statutory procedure followed in the trial court. (*Cadlo v. Owens-Illinois, Inc.* (2004) 125 Cal.App.4th 513, 523 [23 Cal.Rptr.3d 1] (*Cadlo*).) A grant of summary judgment is proper "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment must negate a necessary element of each of the plaintiff's causes of action or establish a complete defense thereto. (Code Civ. Proc., § 437c, subd. (*o*).) If the defendant meets its burden of production by making a prima facie showing of the nonexistence of any triable issue of material fact, then the burden shifts to the opposing party, who must then make a prima facie showing that triable issues of material fact exist. (Code Civ. Proc., § 437c, subd. (p)(2); *Weber v. John Crane, Inc.* (2006) 143 Cal.App.4th 1433, 1437 [50 Cal.Rptr.3d 71].)

In performing our review, we must view the evidence in a light favorable to Mrs. Taylor as the losing party, liberally construing her evidentiary showing while strictly scrutinizing respondents' showing and resolving any doubts or ambiguities in Mrs. Taylor's favor. (*Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 100 [41 Cal.Rptr.3d 229].) "[W]e examine the facts presented to the trial court and determine their effect as a matter of law." (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 464 [63 Cal.Rptr.2d 291, 936 P.2d 70] (*Parsons*).)

## II. *Respondents Are Not Strictly Liable on a Failure to Warn Theory*

█ Mrs. Taylor seeks to ground her strict liability cause of action against respondents on their failure to warn of the dangers inherent in the asbestos-containing materials that were manufactured by others and used with respondents' products. As we explain below, respondents are not liable under this theory for three related reasons. First, California law restricts the duty to warn to entities in the chain of distribution of the defective product. Second, in California, a manufacturer has no duty to warn of defects in products supplied by others and used in conjunction with the manufacturer's product unless the manufacturer's product itself causes or creates the risk of harm. Third, manufacturers or suppliers of nondefective component parts bear no liability when they simply build a product to a customer's specifications but do not substantially participate in the integration of their components into the final product. After setting out some general principles of the law of strict liability and failure to warn, we will address each of these rationales.

### A. *General Principles of Products Liability and the Duty to Warn*

█ California's products liability doctrine "provides generally that manufacturers, retailers, and others in the marketing chain of a product are strictly liable in tort for personal injuries caused by a defective product." (*Peterson v. Superior Court* (1995) 10 Cal.4th 1185, 1188 [43 Cal.Rptr.2d 836, 899 P.2d 905] (*Peterson*); accord, *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 477–478 [127 Cal.Rptr.2d 614, 58 P.3d 450].) "The rules of products liability 'focus responsibility for defects, whether negligently or nonnegligently caused, on the manufacturer of the completed product.' " (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 478–479 [110 Cal.Rptr.2d 370, 28 P.3d 116], quoting *Vandermark v. Ford Motor Co.* (1964) 61 Cal.2d 256, 261 [37 Cal.Rptr. 896, 391 P.2d 168] (*Vandermark*).) As the California Supreme Court explained three decades ago, the basis for imposing strict products liability on a particular defendant is that "he has marketed or distributed a defective product." (*Daly v. General Motors Corp.* (1978) 20 Cal.3d 725, 739 [144 Cal.Rptr. 380, 575 P.2d 1162].)

█ This legal responsibility has been extended to successor corporations (*Ray v. Alad Corp.* (1977) 19 Cal.3d 22, 31 [136 Cal.Rptr. 574, 560 P.2d 3]), and retailers of the manufactured product in issue (*Vandermark, supra,* 61 Cal.2d at p. 262), among other entities in the chain of distribution of the injury-causing manufactured product. Another phrase for this notion of responsibility is the "stream of commerce" theory. (*Edwards v. A.L. Lease & Co.* (1996) 46 Cal.App.4th 1029, 1033 [54 Cal.Rptr.2d 259].) "[S]trict liability may attach even if the defendant did not have actual possession of the defective product or control over the manner in which the product was

designed or manufactured." (*Bay Summit Community Assn. v. Shell Oil Co.* (1996) 51 Cal.App.4th 762, 774 [59 Cal.Rptr.2d 322].) Consequently, evidence that a defendant received royalties and financial benefits, allowed the actual manufacturer to use its trademark or advertising network, supplied machinery parts and specifications for the manufacture of the injury-producing product, and like connections have sufficed collectively to impose liability under the "stream of commerce" standard. (*Kasel v. Remington Arms Co.* (1972) 24 Cal.App.3d 711, 727 [101 Cal.Rptr. 314].) "It is the defendant's participatory connection, for his personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product . . . with the manufacturer or other entities involved in the manufacturing-market system . . . which calls for imposition of strict liability." (*Id.* at p. 725.) This nexus of liability is present, as one court succinctly summarized, if the plaintiff's evidence establishes "(1) the defendant received a direct financial benefit from its activities and from the sale of the product; (2) the defendant's role was integral to the business enterprise such that the defendant's conduct was a necessary factor in bringing the product to the initial consumer market; and (3) the defendant had control over, or a substantial ability to influence, the manufacturing or distribution process." (*Bay Summit Community Assn., supra,* 51 Cal.App.4th at p. 776.) It is a plaintiff's burden to produce evidence of these factors linking the injury-producing product with a particular entity in the stream of commerce of that product.

■■ The evolution of this notion reflects a bright-line legal distinction tied to the *injury-producing product* in the stream of commerce. Other manufacturers cannot be expected to determine the relative dangers of various products they do not produce or sell and certainly do not have a chance to inspect or evaluate. This legal distinction acknowledges that overextending the level of responsibility could potentially lead to commercial as well as legal nightmares in product distribution. And California cases have acknowledged the need for this restraint.

Thus, liability for product defects, while strict, is not absolute. (*Carlin v. Superior Court* (1996) 13 Cal.4th 1104, 1110 [56 Cal.Rptr.2d 162, 920 P.2d 1347]; *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 568, fn. 5 [34 Cal.Rptr.2d 607, 882 P.2d 298]; *Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 994 [281 Cal.Rptr. 528, 810 P.2d 549] (*Anderson*); *Daly v. General Motors Corp., supra,* 20 Cal.3d at p. 733.) Manufacturers are not insurers of their products and are liable in tort only when defects in their products cause injury. (*Soule v. General Motors Corp., supra,* 8 Cal.4th at p. 568, fn. 5.) The application of strict liability in any particular factual setting is determined largely by the policies that underlie the doctrine. (See *Anderson, supra,* 53 Cal.3d at p. 995.) In *Peterson,* our high court elaborated on the aforementioned stream of commerce limitation on strict liability.

*Peterson* held that it would be inappropriate to impose strict liability on an entity "that is not a part of the manufacturing or marketing enterprise of the allegedly defective product that caused the injury in question." (*Peterson, supra,* 10 Cal.4th at p. 1188.) Entities " ' "outside the original chain of distribution" ' " of the allegedly defective product are not to be held strictly liable for defects because imposing liability on them would serve none of the policies that justify the doctrine. (*Id.* at pp. 1199, 1201–1202, 1209.)

■ Under California law, strict products liability has been invoked for three types of product defects: (1) manufacturing defects, (2) design defects, and (3) "warning defects." (*Anderson, supra,* 53 Cal.3d at p. 995.) We are here concerned solely with the third category, which applies to "products that are dangerous because they lack adequate warnings or instructions." (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 428 [143 Cal.Rptr. 225, 573 P.2d 443].) Our law recognizes that even " 'a product flawlessly designed and produced may nevertheless possess such risks to the user without a suitable warning that it becomes "defective" simply by the absence of a warning.' [Citation.]" (*Finn v. G. D. Searle & Co.* (1984) 35 Cal.3d 691, 699 [200 Cal.Rptr. 870, 677 P.2d 1147].) Thus, manufacturers have a duty to warn consumers about the hazards inherent in their products.[6] (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64 [74 Cal.Rptr.3d 108, 179 P.3d 905].) The purpose of requiring adequate warnings is to inform consumers about a product's hazards and faults of which they are unaware, so that the consumer may then either refrain from using the product altogether or avoid the danger by careful use. (*Ibid.*; see also *Finn v. G. D. Searle & Co., supra,* at p. 699 [noting that warnings may instruct consumer as to product's proper use or inform consumer of risks or side effects that may follow foreseeable use of the product].)

   B.   *Respondents Are Not Strictly Liable Because They Were Not Part of the Chain of Distribution of the Injury-causing Products*

In *Peterson,* the California Supreme Court considered whether a hotel owner could be held strictly liable for injuries sustained when a hotel guest slipped in the bathtub of her guest room. (*Peterson, supra,* 10 Cal.4th at pp. 1189, 1190.) The plaintiff in *Peterson* alleged that the bathtub was defective because it " 'was so smooth, slippery, and slick as to have provided no friction or slip resistance whatsoever.' " (*Id.* at p. 1189.) Overruling its

---

[6] Our discussion of the duty to warn issue necessarily assumes that the dangers of asbestos were either known or knowable during the relevant time period. Respondents had no duty to warn of unknowable risks. (*Anderson, supra,* 53 Cal.3d at p. 1000 [knowledge or knowability of risk is element of cause of action for strict liability alleging failure to warn].) The parties make little mention of this issue in their briefs, but we will assume solely for the purposes of our discussion that the risks of asbestos were known or knowable during the period in question.

earlier decision in *Becker v. IRM Corp.* (1985) 38 Cal.3d 454 [213 Cal.Rptr. 213, 698 P.2d 116], the *Peterson* court held that "it would be improper to impose strict liability under products liability principles upon a hotel proprietor for injuries caused by an alleged defect in the hotel premises that the hotel proprietor did not create or market." (*Peterson*, at p. 1188.) The court reasoned that the rationales for imposing strict liability on manufacturers or retailers did not apply to the hotel owner because the owner was not part of "the chain of distribution" of the bathtub that allegedly caused the injury. (*Id.* at p. 1199.) As a consequence, the hotel owner lacked a continuing business relationship with the manufacturer, and thus could not exert pressure upon the manufacturer of the defective product to make the product safe. (*Ibid.*; cf. *Vandermark, supra*, 61 Cal.2d at pp. 262–263 [retailers may be strictly liable because they "are an integral part of the overall producing and marketing enterprise" and thus "may be in a position to exert pressure on the manufacturer" to make the product safe].)

We faced a similar question in our recent decision in *Cadlo, supra*, 125 Cal.App.4th 513. In *Cadlo*, a former Navy machinist's mate sued Owens-Illinois, Inc., after he was exposed on board the USS Black to Kaylo, an asbestos-containing insulation that Owens-Illinois manufactured between 1943 and 1958. (*Id.* at pp. 516–517.) The plaintiff served aboard the USS Black between 1965 and 1968, but Owens-Illinois had sold its Kaylo division to Owens-Corning Fiberglas Corporation (OCF) in 1958 and had thereafter ceased all manufacture, sale, and distribution of Kaylo. (*Id.* at p. 516.) It was therefore undisputed that any Kaylo to which the plaintiff had been exposed was manufactured only by OCF, not Owens-Illinois. (*Id.* at p. 517.)

We affirmed the trial court's grant of summary judgment to Owens-Illinois, because the plaintiff presented no evidence that Owens-Illinois "played any role in the design, manufacture, distribution, or marketing of OCF's Kaylo." (*Cadlo, supra*, 125 Cal.App.4th at p. 524.) We explained that the purpose of strict liability is to ensure " ' "that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market." ' " (*Ibid.*, quoting *Price v. Shell Oil Co.* (1970) 2 Cal.3d 245, 251 [85 Cal.Rptr. 178, 466 P.2d 722].) As a result, "a continuous course of business is a necessary condition for application of the rule." (*Cadlo, supra*, 125 Cal.App.4th at p. 524.) Since Owens-Illinois had had no business association with, financial interest in, or control over Kaylo for seven years by the time the plaintiff was first exposed to the product, it was not " 'an integral part of the overall producing and marketing enterprise' of OCF's Kaylo" and could not be held strictly liable as a matter of law. (*Id.* at p. 525.)

*Peterson* and *Cadlo* make clear that respondents cannot be strictly liable for failing to warn of the dangers inherent in the asbestos-containing materials that were used with their products. Respondents were not part of the "chain of distribution" of the gaskets, packing, discs, and insulation that Mr. Taylor encountered during his service on the Hornet in the 1960's. It is undisputed that all of the original asbestos-containing materials that may have been supplied when respondents delivered their equipment to the Navy in 1943 had been removed by the time Mr. Taylor served aboard the Hornet. Even if respondents were part of the chain of distribution of these original materials, they were certainly not part of the chain of distribution for the asbestos-containing materials to which Mr. Taylor was exposed. (See *Cadlo, supra,* 125 Cal.App.4th at p. 525.)

In her reply brief, Mrs. Taylor contends that respondents are liable for Mr. Taylor's exposure to the asbestos-containing components that replaced the original internal gaskets and packing that had been included by respondents when they shipped their equipment to the Navy. She cites no case for this argument, and *Cadlo* demonstrates that it is fundamentally flawed. We held in *Cadlo* that Owens-Illinois could not be held strictly liable for Kaylo, a product that it developed and then marketed for 15 years, because the company had ceased the manufacture, sale, and distribution of this product several years before Cadlo was exposed to it. (*Cadlo, supra,* 125 Cal.App.4th at pp. 516, 524–525.) Respondents are even further removed from the overall producing and marketing enterprise of the replacement internal gaskets and packing than Owens-Illinois was from that of Kaylo. Owens-Illinois itself had created and marketed Kaylo, and thus certainly had played the principal role in the original development and marketing of the product. (*Id.* at p. 516.) In addition, Cadlo was injured by that very same product, though it had been produced by another manufacturer. (*Id.* at p. 517.) If Owens-Illinois could not be strictly liable for injuries caused by a product that it had originally created and marketed, then respondents surely cannot be liable for asbestos-containing products with which they had no connection at all.

Respondents were simply "not a part of the manufacturing or marketing enterprise of the allegedly defective product[s] that caused the injury in question." (*Peterson, supra,* 10 Cal.4th at p. 1188.) Consequently, they may not be held strictly liable under California law for such products.

C. *California Law Recognizes No Duty to Warn of Defects in Another Manufacturer's Products*

A second reason for holding that respondents owed no duty to warn is that the agent that caused Mr. Taylor's injury did not come from respondents' equipment itself, but instead was released from products made or supplied by

other manufacturers and used in conjunction with respondents' equipment. Mrs. Taylor nevertheless contends that "California law also imposes liability on a manufacturer who fails to warn of hazards arising from the foreseeable use of its product, where the hazard arises from the combination of . . . its product and a product manufactured by another." In essence, she argues that a duty to warn exists whenever it is foreseeable that the intended use of a product will expose users or consumers to a risk created solely by the product of another. Respondents disagree, arguing that in California, a manufacturer's duty to warn is limited to the manufacturer's own products. Our review of both the case law and relevant policy considerations persuades us that respondents have the better of this argument. Although a manufacturer *may* owe a duty to warn when the use of its product in combination with the product of another creates a potential hazard, that duty arises *only* when the manufacturer's own product causes or creates the risk of harm.

Although California cases considering this precise question are not numerous, they uniformly support respondents' position. For example, in *Garman v. Magic Chef, Inc.* (1981) 117 Cal.App.3d 634 [173 Cal.Rptr. 20] (*Garman*), the plaintiffs sued for injuries caused when a cooking stove installed in their motor home exploded. (*Id.* at p. 636.) There was no dispute that the explosion was not caused by any physical defect in the stove, but rather by a leak from a copper tube that carried propane gas from a tank to the stove, thus "permitting propane gas to leak out and form a pool of flammable vapor." (*Id.* at pp. 636, 637.) When appellant's wife lit the stove, the escaped gas ignited and caused an explosion and fire. (*Id.* at pp. 636–637.) The plaintiffs sought to recover against the stove manufacturer on a failure to warn theory, arguing that "the stove manufacturer had a duty to warn that a lighted but properly operating stove might ignite gas leaking from some other place." (*Id.* at p. 637.)

The Court of Appeal rejected the plaintiffs' argument and affirmed summary judgment for the manufacturer. (*Garman, supra*, 117 Cal.App.3d at pp. 638–639.) The court acknowledged that "[a] failure to warn may create liability for harm caused by use of an unreasonably dangerous product," but concluded this rule "does not apply to the facts in this case *because it was not any unreasonably dangerous condition or feature of respondent's product* which caused the injury. To say that the absence of a warning to check for gas leaks in other products makes the stove defective is semantic nonsense." (*Id.* at p. 638, italics added.) The court went on to explain: "The use of any product can be said to involve some risk because of the circumstances surrounding even its normal use. Nonetheless, the makers of such products are not liable under any theory, for merely failing to warn of injury which may befall a person who uses that product in an unsafe place or in conjunction with another product which because of a defect or improper use is itself unsafe." (*Ibid.*) Because the stove "did not *cause or create the risk of*

*harm*," the *Garman* court held that the manufacturer of the stove "was under no duty to warn of the possible defect in the product of another and is not liable for failure to do so." (*Id.* at pp. 638, 639, italics added.)

*Blackwell v. Phelps Dodge Corp.* (1984) 157 Cal.App.3d 372 [203 Cal.Rptr. 706] (*Blackwell*) applied *Garman*'s rationale in a different factual context. The defendant in *Blackwell* sold sulfuric acid to McKesson Chemical Company, which shipped the acid to its plant in a tank car designed and owned by Union Tank. (*Id.* at p. 375.) During shipment, pressure built up in the tank car, and when the plaintiffs attempted to unload the tank car and transfer the acid to a storage tank, the acid escaped and came into contact with the plaintiffs. (*Ibid.*) The plaintiffs sued the seller of the acid, alleging the seller had a duty to warn them of the possible accumulation of pressure in the tank car and to provide instructions on how to unload it safely. (*Id.* at pp. 375–376.)

The *Blackwell* court rejected the plaintiffs' theory and affirmed summary judgment for the defendant. (*Blackwell, supra,* 157 Cal.App.3d at pp. 377–380.) Citing *Garman*, the court explained that "[w]hile failure to warn may create liability for harm caused by use of an unreasonably dangerous product, that rule does not apply where it was not any unreasonably dangerous condition or feature of *defendant's* product which caused the injury." (*Id.* at p. 377.) The reason the seller of the acid bore no liability was because "it was not the product (acid) supplied by defendant, but the container (tank car) in which that product was shipped, which was allegedly defective for lack of warnings or instructions. Under these circumstances, defendant incurred no liability to plaintiffs for its failure to warn them of danger from formation of pressure in the acid allegedly caused by defective design of the tank car, or to instruct them on how safely to unload the acid from the tank." (*Id.* at p. 378.)

The year following the decision in *Blackwell*, the court in *Powell v. Standard Brands Paint Co.* (1985) 166 Cal.App.3d 357 [212 Cal.Rptr. 395] (*Powell*) surveyed California case law on this issue and noted that "no reported decision has held a manufacturer liable for its failure to warn of risks of using its product, where it is shown that the immediate efficient cause of injury is a product manufactured by someone else." (*Id.* at p. 362.) In *Powell*, the Court of Appeal affirmed a grant of summary judgment to a manufacturer of lacquer thinner. (*Id.* at pp. 361, 367.) The plaintiffs in *Powell* had been injured by an explosion that occurred while they were stripping a tile floor. (*Id.* at p. 360.) Although the plaintiffs had been using a thinner manufactured by defendant Standard Brands on the day before the explosion, it was undisputed that on the day the explosion took place, the plaintiffs were using a thinner manufactured by a different company (Grow) and the

immediate, efficient cause of the plaintiffs' injuries was Grow's product, not Standard Brands's. (*Id.* at pp. 361, 363.) The plaintiffs contended Standard Brands had breached its duty to warn them of the dangerous properties of its lacquer thinner. (*Id.* at p. 362.)

Although the Court of Appeal concluded Standard Brands had failed to refute the plaintiffs' assertion that it owed them a duty to warn of the dangers of its own product and had breached that duty, the court nevertheless held that the explosion of Grow's product was not a reasonably foreseeable consequence of Standard Brands's failure to warn. (*Powell, supra,* 166 Cal.App.3d at pp. 363, 364.) The court explained: "Although there appears to be some uncertainty about the knowledge required of a manufacturer to justify liability for failure to warn of *its* product [citation], it is clear the manufacturer's duty is restricted to warnings based on the characteristics of *the manufacturer's own product.* [Citations.] Understandably, the law does not require a manufacturer to study and analyze the products of others and to warn users of risks of those products. A manufacturer's decision to supply warnings, and the nature of any warnings, are therefore necessarily based upon and tailored to the risks of use of the manufacturer's own product."[7] (166 Cal.App.3d at p. 364.)

Consistent with these opinions is a more recent decision by Chief Judge Walker of the United States District Court for the Northern District of California. In *In re Deep Vein Thrombosis* (N.D.Cal. 2005) 356 F.Supp.2d 1055 (*Deep Vein*), a group of airline passengers who developed a condition known as deep vein thrombosis (DVT) sued commercial airlines and aircraft manufacturer Boeing, alleging that prolonged and cramped seating on aircraft created a risk of developing DVT. (*Id.* at p. 1058.) The plaintiffs alleged that Boeing had a duty to warn the airlines about things such as the risk of DVT

---

[7] Although the California Supreme Court has not addressed this question directly, we observe that it has described a manufacturer's liability for failure to warn in terms of the manufacturer's responsibility to alert consumers of defects in the manufacturer's *own* products. (*Johnson v. American Standard, Inc., supra,* 43 Cal.4th at p. 64 ["manufacturers have a duty to warn consumers about the hazards inherent in *their products*" (italics added)]; *Soule v. General Motors Corp., supra,* 8 Cal.4th at p. 568, fn. 5 ["manufacturers . . . are liable in tort only when 'defects' in *their products* cause injury" (italics added)]; see also *Anderson, supra,* 53 Cal.3d at p. 1003 ["the manufacturer is liable if it failed to give warning of dangers that were known to the scientific community at the time *it manufactured or distributed the product*" (italics added)]; *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897] ["[a] manufacturer is strictly liable in tort when an article *he places on the market,* knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being" (italics added)].) Thus, in those cases in which the California Supreme Court has discussed a manufacturer's liability for failure to warn of product defects, the court has referred to the manufacturer's liability for products sold or distributed by the manufacturer in question, not for products sold or distributed by others.

from unsafe seat design and seating configuration and the preventive measures passengers could take to reduce the risk of developing the condition. (*Id.* at p. 1067.) The court rejected the plaintiffs' argument, noting "the court can find no case law that supports the idea that a manufacturer, after selling a completed product to a purchaser, remains under a duty to warn the purchaser of potentially defective additional pieces of equipment that the purchaser may or may not use to complement the product bought from the manufacturer." (*Id.* at p. 1068.) The court also dismissed the argument that Boeing was under a duty to warn passengers of the risks of DVT, explaining "[p]laintiffs do not cite any case law for the proposition that a manufacturer, after its product is sold to a purchaser, is under a duty to warn a third party (with whom the manufacturer has never had contact) that the purchaser may or may not have supplemented the manufacturer's completed product with an allegedly defective piece of equipment." (*Ibid.*)

Thus, to date, California case law has not imposed on manufacturers a duty to warn about the dangerous propensities of other manufacturers' products.[8] California courts will not impose a duty to warn on a manufacturer where the manufacturer's product "did not cause or create the risk of harm." (*Garman, supra,* 117 Cal.App.3d at p. 638.) As one commentary explains, "[t]he product must, in some sense of the word, 'create' the risk. If it does not, then the manufacturer should not be required to supply warnings, even if the risks are not obvious to users and consumers." (Henderson & Twerski, *Doctrinal Collapse in Products Liability: The Empty Shell of Failure to Warn* (1990) 65 N.Y.U. L.Rev. 265, 284.) As California law now stands, unless the manufacturer's product in some way causes or creates the risk of harm, "the risks of the manufacturer's own product . . . are the only risks [the manufacturer] is required to know." (*Powell, supra,* 166 Cal.App.3d at p. 364.)

---

[8] Leading California commentators agree that a manufacturer's duty to warn of defects is limited to the manufacturer's own products. (See 1 Haning et al., Cal. Practice Guide: Personal Injury (The Rutter Group 2008) ¶ 2:643, p. 2-166 (rev. # 1, 2005) ["strict liability for failure to warn rests only with the particular defendant in the marketing chain responsible for the product that *creates* the unreasonably dangerous propensity"]; 2 Hersh & Smith, Cal. Civil Practice (Bancroft-Whitney 1998) Torts, § 24:28, p. 38 ["A manufacturer's duty to warn is also limited to warnings based on the characteristics of the manufacturer's own product."]; accord, American Law of Products Liability (3d ed. 2002) § 16:37, p. 16-58 ["In a strict liability case, it is necessary to establish the defendant's connection with the injury-causing product, i.e., that the defendant manufactured the product, sold the product to the plaintiff, or in some other specified manner placed the product in the stream of commerce"]; see also 50A Cal.Jur.3d (2005) Products Liability, § 69, p. 649.)

### D. *The Component Parts Doctrine Shields Respondents From Liability*

■ California cases involving the liability of component part manufacturers also support our conclusion that respondents should not be strictly liable for failing to warn of the hazards of other manufacturers' products. Under the component parts doctrine, the manufacturer of a product component is not liable for injuries caused by the finished product into which the component is incorporated unless the component itself was defective at the time it left the manufacturer. (*Jimenez v. Superior Court, supra*, 29 Cal.4th at p. 480; *Tellez-Cordova v. Campbell-Hausfeld/Scott Fetzger Co.* (2004) 129 Cal.App.4th 577, 581 [28 Cal.Rptr.3d 744] (*Tellez-Cordova*); *Wiler v. Firestone Tire & Rubber Co.* (1979) 95 Cal.App.3d 621, 629 [157 Cal.Rptr. 248] (*Wiler*); see Rest.3d Torts, Products Liability, § 5, subd. (a).) Two policy considerations support this rule. First, requiring suppliers of component parts to ensure the safety of their materials as used in other entities' finished products " 'would require suppliers to "retain an expert in the client's field of business to determine whether the client intends to develop a safe product.' " [Citation.] Suppliers of 'products that have multiple industrial uses' should not be forced 'to retain experts in a huge variety of areas in order to determine the possible risks associated with each potential use.' [Citation.] A second, related rationale is that 'finished product manufacturers know exactly what they intend to do with a component or raw material and therefore are in a better position to guarantee that the component or raw material is suitable for their particular applications.' [Citation.]" (*Springmeyer v. Ford Motor Co.* (1998) 60 Cal.App.4th 1541, 1554 [71 Cal.Rptr.2d 190] (*Springmeyer*); accord, Rest.3d Torts, Products Liability, § 5, com. a, p. 131.)

Although Mrs. Taylor acknowledges respondents provided equipment that was intended to operate as part of a larger "marine steam propulsion system," she claims the component parts doctrine applies only "to manufacturers of fungible, multi-use components that can be used for myriad purposes." Mrs. Taylor's argument appears to be that because respondents' equipment was manufactured to the Navy's specifications for the purpose of incorporation into the Hornet's propulsion system, the valves, pumps, and DFT's were not truly "fungible, multi-use components" and had only one use. This argument misapprehends the factors that make the component parts doctrine applicable. That respondents manufactured their equipment to Navy specifications does not deprive them of the component parts defense. In *Artiglio v. General Electric Co.* (1998) 61 Cal.App.4th 830 [71 Cal.Rptr.2d 817], the defendant manufactured silicone in accordance with "particular specifications as to the physical properties [its customers] wanted in the silicone." (*Id.* at p. 834.) Despite having manufactured a product to particular specifications, and thus arguably limiting its uses, the court held that the factors underlying the component parts doctrine relieved the defendant of liability as a matter of

law. (*Id.* at pp. 837–841.) The Restatement Third of Torts, Products Liability agrees: "A component seller who simply designs a component to its buyer's specifications, and does not substantially participate in the integration of the component into the design of the product, is not liable within the meaning of Subsection (b)."[9] (Rest.3d Torts, Products Liability, § 5, com. e, p. 135.) The mere fact that respondents followed Navy specifications when producing their products does not preclude them from invoking the component parts doctrine.

Having determined that the doctrine applies, we turn to the issue of liability. California law makes the liability of a component part manufacturer dependent on two factors: (1) whether the component itself was defective when it left the component manufacturer's factory, and (2) whether these defects caused injury. (*Jimenez v. Superior Court, supra,* 29 Cal.4th at p. 480; accord, Rest.3d Torts, Products Liability, § 5, subd. (a).) In this case, the second factor is not present because there is no claim that respondents' equipment released the asbestos that caused Mr. Taylor's injuries.[10] Instead, it is undisputed that Mr. Taylor's injuries were caused by his exposure to asbestos fibers released from gaskets, packing, and insulation manufactured by other companies, and installed long after respondents' products were supplied to the Navy.[11] Further, there is no evidence that respondents participated in the integration of their components into the design of the Hornet's propulsion system. (See Rest.3d Torts, Products Liability, § 5, subd. (b).) Instead, it is undisputed that respondents provided components in accordance with Navy specifications. On these facts, respondents are not liable as a matter of law.

Our conclusion is not affected by the fact that the use of asbestos-containing materials with respondents' equipment was both foreseeable and anticipated by respondents. " '[T]he alleged foreseeability of the risk of the

---

[9] Restatement Third of Torts, Products Liability, section 5, subdivision (b) recognizes that liability may be imposed on the seller or distributor of a component part where the seller or distributor "substantially participates in the integration of the component into the design of the product," the integration causes the product to be defective, and the defect causes harm. (Rest.3d Torts, Products Liability, § 5.)

[10] The fact that respondents did not manufacture or supply the asbestos-containing materials that caused Mr. Taylor's injuries is what distinguishes this case from *Springmeyer,* on which Mrs. Taylor relies. In that case, the plaintiff was injured when a blade broke off from a cooling fan installed in a truck engine on which the plaintiff was working. (*Springmeyer, supra,* 60 Cal.App.4th at p. 1547.) The issue before the *Springmeyer* court was whether the component parts doctrine shielded from liability the manufacturer of the injury-causing fan. (*Id.* at pp. 1550–1555.) Moreover, there was significant evidence of the fan manufacturer's participation in the design and testing of the fan for use in all of the engines in which the fan was installed. (*Id.* at pp. 1550–1553; see Rest.3d Torts, Products Liability, § 5, subd. (b).)

[11] Mrs. Taylor concedes this in her opening brief, stating "the *asbestos-containing components* operated exactly as intended, and the intended use exposed Mr. Taylor to the hazard of contracting mesothelioma." (Italics added.)

finished product is irrelevant to determining the liability of the component part manufacturer because imposing such a duty would force the supplier to retain an expert in every finished product manufacturer's line of business and second-guess the finished product manufacturer whenever any of its employees received any information about any potential problems.' " (*Artiglio v. General Electric Co., supra*, 61 Cal.App.4th at pp. 838–839, quoting *Kealoha v. E.I. Du Pont de Nemours & Co*. (D. Hawaii 1994) 844 F.Supp. 590, 594.) California case law provides several examples of this principle. A hotel owner is not liable for injuries caused by an excessively slippery bathtub that the owner did not produce, even though it is contemplated that guests will use the bathtub. (*Peterson, supra*, 10 Cal.4th at pp. 1199–1200.) While it is unquestionably foreseeable that a valve stem will be attached to a tire, the manufacturer of a nondefective tire is not liable when another manufacturer's defective valve stem causes injury. (*Wiler, supra*, 95 Cal.App.3d at pp. 629–630; *Zambrana v. Standard Oil Co*. (1972) 26 Cal.App.3d 209, 217–218 [102 Cal.Rptr. 699].) It is likewise foreseeable that a skeleton truck chassis, produced for the express purpose of being used by commercial purchasers to make complete trucks, may be modified in a way that renders the final product unsafe, but the manufacturer of the skeleton truck chassis is not therefore liable for injuries caused by its customer's modification. (*Fierro v. International Harvester Co*. (1982) 127 Cal.App.3d 862, 868–870 [179 Cal.Rptr. 923].) And there can be little doubt that a manufacturer of passenger aircraft knows the airlines purchasing its airplanes will install passenger seats in them, but the manufacturer is not liable for injuries allegedly caused by the airlines' defective placement of the seats. (*Deep Vein, supra*, 356 F.Supp.2d at p. 1063.) As these cases illustrate, foreseeability alone is not sufficient to justify the imposition of a duty to warn on the manufacturer of a component part.

### E.  *The Cases Mrs. Taylor Cites Are Distinguishable*

Mrs. Taylor relies heavily on three cases from the California Courts of Appeal in support of her contention that California law imposes liability on a manufacturer that fails to warn of hazards arising from the foreseeable use of its product, where the hazard arises from the combination of its product and a product manufactured by another. (See *Tellez-Cordova, supra*, 129 Cal.App.4th 577; *Wright v. Stang Manufacturing Co*. (1997) 54 Cal.App.4th 1218 [63 Cal.Rptr.2d 422] (*Wright*); *DeLeon v. Commercial Manufacturing & Supply Co*. (1983) 148 Cal.App.3d 336 [195 Cal.Rptr. 867] (*DeLeon*).) These cases are distinguishable because in *Tellez-Cordova* and *Wright* a defect in the defendant manufacturer's product itself caused or created the risk of harm, while in *DeLeon* the defendant was involved in the design of the finished product.

In *Tellez-Cordova*, the plaintiff, a lampmaker, alleged he had developed a pulmonary illness because he cut, sanded, and ground metal parts, working with and around grinders, sanders, and saws manufactured by the defendants. (*Tellez-Cordova, supra*, 129 Cal.App.4th at p. 579.) According to his complaint, the plaintiff's illness was the "result of exposure to airborne toxic substances produced and released from the metal parts and from the discs, belts, and wheels used on the grinders, sanders, and saws." (*Ibid.*) He brought a products liability action, alleging that the defendants' "tools were specifically designed to be used with abrasive wheels or discs, 'for the intended purpose of grinding and sanding metals' " and that when the tools were used for their intended purpose, "respirable metallic dust from the metal being ground and from the abrasive wheels and discs was generated and released into the air, causing the injury . . . ." (*Id.* at p. 580.)

The defendants demurred, and citing *Powell* and *Garman*, they argued that "the law in California is that a manufacturer need not warn of defects in the products of another." (*Tellez-Cordova, supra*, 129 Cal.App.4th at p. 585.) The Second District did not disagree with the defendants on this point of law, but it rejected the argument because it "misse[d] the point of appellants' complaint, which is that *respondents' tools created the dust*, even if the dust did not come directly from the tools. . . ." (*Ibid.*, italics added.) Indeed, the plaintiff described the complaint as alleging "the discs and wheels do not create respirable metallic dust unless they are used with respondents' power tools, because it is the speed and the force of those tools which cause the dust to become airborne." (*Id.* at p. 580.) The court went on to note that "the allegation is that the abrasive products were not dangerous without the power of the tools." (*Id.* at p. 585.)

The court's discussion makes plain two crucial distinctions between *Tellez-Cordova* and the case before us. First, in *Tellez-Cordova*, the plaintiff alleged that it was the action of *respondents' tools themselves* that created the injury-causing dust. Here, in contrast, Mr. Taylor's injuries were caused not by any action of respondents' products, but rather by the release of asbestos from products produced by others. This is a key difference, because before strict liability will attach, the defendant's product must "cause or create the risk of harm."[12] (*Garman, supra*, 117 Cal.App.3d at p. 638.) Second, unlike

---

[12] This same principle serves to distinguish the other California cases upon which Mrs. Taylor relies. In two of those cases, the defendant manufacturers were held to have a duty to warn where defects in their *own* products caused the plaintiffs' injuries. (*Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1, 16–18 [56 Cal.Rptr.2d 455] [jury could reasonably determine that defective design of defendant's valve and deficient warnings caused decedent's death]; *Putensen v. Clay Adams, Inc.* (1970) 12 Cal.App.3d 1062, 1074, 1076–1079 [91 Cal.Rptr. 319] [manufacturer of polyethylene tubing liable for negligent failure to warn when tubing kinked during heart catheterization procedure and injured plaintiff; manufacturer not strictly liable in tort].) Three other California authorities cited by Mrs. Taylor all involved a manufacturer's

the abrasive wheels and discs in *Tellez-Cordova*, which were not dangerous without the power of the defendants' tools, the asbestos-containing products at issue in our case were themselves inherently dangerous. It was their asbestos content—not any feature of respondents' equipment—that made them hazardous. In contrast to the abrasive wheels and discs in *Tellez-Cordova*, manipulation and removal of the asbestos-containing products at issue here would have presented a danger to Mr. Taylor's health whether they were used in combination with respondents' equipment, some other type of equipment, or even all by themselves. *Tellez-Cordova* is therefore not a case in which the defendants had a duty to warn *solely* of the hazards of other manufacturers' products.

*Wright* is distinguishable for similar reasons. That case was a products liability action brought by a firefighter who was injured when a "deck gun," or water cannon, mounted on a firetruck broke loose while under pressure from the water pump, throwing plaintiff Wright into the air and onto the ground, where the deck gun landed on top of him. (*Wright, supra*, 54 Cal.App.4th at p. 1222.) The trial court granted summary judgment to Stang, the manufacturer of the deck gun. (*Id.* at pp. 1226–1227.) On appeal, Stang contended that it could not be liable because the deck gun itself did not fail; the accident occurred when the riser pipe to which the deck gun was attached broke at the point where the riser was mounted on the firetruck. (*Id.* at pp. 1223, 1229.)

The Court of Appeal rejected Stang's contention, but it did not hold that a manufacturer has a duty to warn of foreseeable hazards arising from the use of its product in combination with the product of another even where the manufacturer's product does not cause or create the risk of harm. Instead, the court noted that Wright alleged not only that the deck gun was defective because of inadequate warnings, but also because it was defectively designed and manufactured. (*Wright, supra*, 54 Cal.App.4th at pp. 1228, 1229.) The court held that summary judgment should have been denied because there were triable issues of fact "on the issue of whether or not the deck gun was defectively designed in that it was not manufactured with a flange mounting

duty to anticipate product misuse or modification. (*Huynh v. Ingersoll-Rand* (1993) 16 Cal.App.4th 825, 833–835 [20 Cal.Rptr.2d 296] [power grinder mismatched with wrong disc]; *Thompson v. Package Machinery Co.* (1971) 22 Cal.App.3d 188, 190, 196 [99 Cal.Rptr. 281] [manufacturer of plastic press liable for foreseeable misuse of safety gate on press]; *Thomas v. General Motors Corp.* (1970) 13 Cal.App.3d 81, 89–90 [91 Cal.Rptr. 301] [washing machine manufacturer could be liable for foreseeable misuse or alteration of machine where rubber "bead" securing glass lid was removed either by vandalism or negligence].) Once again, the unexpected and immediate cause of injury in each of these cases was a misuse or alteration of the defendant manufacturers' own products, and the manufacturers were in the best position to anticipate such misuses or alterations. In the case before us, however, the undisputed cause of Mr. Taylor's injury was the release of asbestos fibers from products not made or supplied by respondents.

system or the capability to have such a system attached to the deck gun." (*Id.* at p. 1229.) In other words, a jury could find that a defect in Stang's product itself was a cause of the injury. The court also held that triable issues of fact existed on Wright's " 'warning defect' " claim. (*Id.* at p. 1236.) But that holding was based on Stang's failure to warn of a foreseeable misuse of its product. (*Id.* at pp. 1235–1236.) Specifically, Stang failed to warn "against the potential dangerous and foreseeable 'mismatch' of the deck gun and riser pipe attachments which did not have adequate strength or design to withstand the water pressures generated with the use of the deck gun, and the alleged foreseeable danger that the deck gun or its attachments may become separated from the fire truck under such pressures." (*Id.* at p. 1236.) In short, in *Wright*, the unexpected, immediate cause of injury was not, as in this case, a toxic agent contained in another manufacturer's product, but was either a design defect in Stang's product itself or a misuse of Stang's product, which Stang was in the best position to anticipate.

Nor does *DeLeon* assist Mrs. Taylor. In that case, the plaintiff, a cannery worker, lost her arm when it became entangled in an exposed rotating line shaft located above the fruit sorter bin she was cleaning. (*DeLeon, supra*, 148 Cal.App.3d at pp. 340–341.) The line shaft had nothing to do with the operation of the bin and was manufactured and installed by the plant owner. (*Id.* at p. 341.) Plaintiff sued Commercial, the manufacturer of the sorter bin, and the trial court granted summary judgment to the defendant, reasoning that Commercial was not responsible for choosing the location of the equipment and since the bin had no inherent defect, Commercial could not be liable for the plaintiff's injury. (*Id.* at p. 340.) On appeal, Commercial argued that it did nothing more than manufacture the bin to the cannery's specifications and that the plant operator had assembled it into the fruit processing line. (*Id.* at p. 342.) As a consequence, Commercial contended that full responsibility for safe operating conditions rested with the plant operator. (*Ibid.*)

The Court of Appeal reversed the grant of summary judgment because it was not presented with a "clear-cut legal question of component part liability, but instead . . . a factual issue of involvement in design." (*DeLeon, supra*, 148 Cal.App.3d at p. 343.) In holding that triable issues of fact existed as to Commercial's liability, the court emphasized that the "principal issue of fact presented below was that of responsibility for design, including location" (*id.* at p. 346), and it concluded summary judgment was inappropriate "assuming that Commercial participated in the design of this custom-made equipment for a particular location in a processing line" (*id.* at p. 347). Thus, in *DeLeon*, the defendant manufacturer's potential liability turned on the factual question of whether it had participated in the design and location of the sorter bin. (See Rest.3d Torts, Products Liability, § 5, subd. (b).) There is

nothing in *DeLeon* that suggests that a manufacturer may be liable for failing to warn of the dangerous qualities of another manufacturer's product.[13]

Mrs. Taylor relies on certain out-of-state cases to support her position here. Chief among them are two intermediate appellate decisions from Washington, cases with facts similar to this case: *Braaten v. Saberhagen Holdings* (2007) 137 Wn.App. 32 [151 P.3d 1010], and *Simonetta v. Viad Corp.* (2007) 137 Wn.App. 15 [151 P.3d 1019]. Unfortunately for appellant, the Supreme Court of Washington has recently overturned the two decisions and adopted the position now advanced by respondents here. (*Braaten v. Saberhagen Holdings* (2008) 165 Wn.2d 373 [198 P.3d 493] (*Braaten II*); *Simonetta v. Viad Corp.* (2008) 165 Wn.2d 341 [197 P.3d 127] (*Simonetta II*).)

While the reasoning in each case deserves comment, the facts in *Braaten II* are especially compatible with our situation. The defendants in *Braaten II* were manufacturers of pumps and valves sold to the Navy for use on its ships. (*Braaten II, supra*, 198 P.3d at p. 495.) Some of the manufacturers' products contained asbestos in the original packing and gaskets of their products, yet that material was not manufactured by the defendants but by third parties. (*Ibid.*) Additionally, the Navy applied asbestos insulation to the respondents' products as needed over time. (*Ibid.*) Plaintiff Braaten worked as a pipefitter on several Navy ships, engaging in regular maintenance of ship fixtures, including the respondents' valves and pumps. (*Id.* at p. 496.) He developed mesothelioma from his exposure to asbestos fibers and brought suit against the defendants on a failure to warn theory. (*Ibid.*) Braaten was not able to establish the number of times the gaskets and packing that originally insulated the defendants' products had been replaced. (*Id.* at pp. 495, 496.) Also, whatever insulation that was used over time had been supplied by manufacturers other than the defendants. (*Id.* at p. 496.) The trial court granted summary judgment for the defendants. (*Ibid.*)

■ The issue in *Braaten II* was whether the defendants had a duty to warn of the dangers of asbestos exposure in replacement packing and gaskets which the defendants did not manufacture, sell, or otherwise supply. (*Braaten II, supra*, 198 P.3d at p. 495.) "We hold that the general rule that there is no duty under common law products liability or negligence principles to warn of the dangers of exposure to asbestos in other manufacturers' products applies with regard to replacement packing and gaskets. The defendants did not sell or supply the replacement packing or gaskets or otherwise place them in the stream of commerce, did not specify asbestos-containing packing and gaskets for use with their valves and pumps, and other types of

---

[13] Respondents Crane and IMO suggest that *DeLeon* has been effectively overruled by the California Supreme Court's decision in *Peterson*. We need not address this argument, because we find *DeLeon* distinguishable in any event.

materials could have been used." (*Id.* at pp. 495–496.) The court also noted that the plaintiff presented insufficient evidence that he was exposed to the original packing and gaskets supplied by these defendants. (*Id.* at p. 496.)

The Washington Supreme Court also dismissed the notion that the defendants would be accountable because asbestos is an inherently dangerous product. (*Braaten II, supra*, 198 P.3d at p. 498.) While a manufacturer of a faultlessly manufactured product may be expected to warn a user on the safe use of its own product, and be liable if it does not, liability will not arise if the failure to warn of the danger of asbestos exposure arises from insulation applied to a defendant's product, which defendant did not manufacture or distribute. (*Ibid.*) "It makes no difference whether the manufacturer knew its products would be used in conjunction with asbestos insulation." (*Ibid.*) These principles limiting liability were described by the court as "the majority rule nationwide." (*Id.* at pp. 498–499 [citing numerous cases].) There is simply no duty to warn of dangers associated with replacement parts, where the manufacturer did not design or make the replacement parts, even if the replacement part is virtually the same as the original item. (*Id.* at p. 502.)

In the companion case *Simonetta II*, the Washington Supreme Court held that Viad, the manufacturer of a functional product (an evaporator, a device that desalinates seawater) that was to be insulated by the Navy with asbestos products, did not have a duty to warn about asbestos hazards since the duty to warn was limited. (*Simonetta II, supra*, 197 P.3d at pp. 129, 130, 134.) A manufacturer of a functionally operating product has no duty to warn about another manufacturer's product. "Under the language of [Restatement Second of Torts], section 388 . . . we hold the duty to warn is limited to those in the chain of distribution of the *hazardous* product. Because Viad did not manufacture, sell, or supply the asbestos insulation, we hold as a matter of law it had no duty to warn under § 388. We reverse the Court of Appeals on the question of negligence." (*Id.* at p. 134, italics added.)

Additionally, regarding strict liability, no responsibility could be attributed to Viad. (*Simonetta II, supra*, 197 P.3d at p. 138.) It manufactured and sold the evaporator, which operated as it was expected to. Viad did not manufacture, sell, or supply the asbestos insulation that triggered the plaintiff's illness. (*Id.* at pp. 130, 134.) Since asbestos insulation was *the* dangerous product under the facts in *Simonetta II*, defendant Viad could not be held responsible for the asbestos contained in another manufacturer's product. (*Id.* at p. 138.)

In sum, the decisions by the Supreme Court of Washington in *Braaten II* and *Simonetta II* provide convincing support for this court's determination of the issues in the appeal and a sound basis for rejecting the intermediate Washington court analysis of these relevant issues.

Besides these recent decisions of the Washington Supreme Court, we note that our conclusion is strongly supported by other persuasive out-of-state authorities that are very closely on point. For example, in *Lindstrom v. A-C Product Liability Trust* (6th Cir. 2005) 424 F.3d 488, Lindstrom, a former merchant seaman, sought recovery for injuries caused by exposure to asbestos-containing equipment found aboard numerous vessels on which he had served. (*Id.* at p. 491.) Lindstrom sought damages from Henry Vogt Machine Company, a valve manufacturer, based on his claim that he had been exposed to asbestos while replacing gaskets and packing on Henry Vogt valves. (*Id.* at pp. 493–494.) Lindstrom had no evidence, however, that any of the gaskets or packing materials he had replaced were the ones originally supplied by Henry Vogt. (*Id.* at pp. 494–495.) Affirming summary judgment for Henry Vogt, the Sixth Circuit held that "this fact compels the conclusion that any asbestos that [Lindstrom] may have been exposed to in connection with a Henry Vogt product would be attributable to some other manufacturer . . . . Henry Vogt cannot be held responsible for material 'attached or connected' to its product on a claim of a manufacturing defect." (*Id.* at p. 495.) The court reached a similar conclusion regarding Lindstrom's claims against Coffin Turbo Pump, Inc., holding that Coffin was not liable for external insulation or replacement gaskets supplied by other manufacturers but attached to Coffin pumps. (*Id.* at pp. 496–497.) Likewise, the court held that Ingersoll-Rand had no liability to Lindstrom even if he could establish that "he came in contact with sheet packing material containing asbestos in connection with an Ingersoll Rand air compressor" because "Ingersoll Rand cannot be held responsible for asbestos containing material that . . . was incorporated into its product post-manufacture." (*Id.* at p. 497.) Like the defendants in *Lindstrom*, respondents in this appeal are not liable for injury-causing materials supplied by third parties and used in conjunction with respondents' products. (Accord, *Ford Motor v. Wood* (1998) 119 Md.App. 1, 10, 30–39 [703 A.2d 1315, 1319, 1329–1333] [Ford not liable for failure to warn of risks of asbestos-containing replacement brake linings produced by other manufacturers although Ford itself produced asbestos-containing brake linings], abrogated on another ground in *Crane v. Scribner* (2002) 369 Md. 369 [800 A.2d 727]; see also *Baughman v. General Motors Corp.* (4th Cir. 1986) 780 F.2d 1131, 1132–1133 [auto manufacturer had no duty to warn of dangers posed by replacement wheel that it neither designed nor manufactured even though replacement wheel was similar to that produced by manufacturer].)

## F.  *Conclusion*

We therefore hold that respondents owed Mr. Taylor no duty to warn of the dangers inherent in the asbestos-containing products supplied by other manufacturers. Imposition of such a duty on these facts would be inconsistent with California case law and would not serve the policies underlying strict

liability. Any such expansion of liability for failure to warn must come, if at all, from the California Supreme Court.

## III. *Respondents Are Not Liable Under a Negligence Theory*

■ We turn now to Mrs. Taylor's negligence theory of liability. A fundamental element of any cause of action for negligence is the existence of a legal duty of care running from the defendant to the plaintiff. (See, e.g., *Williams v. Beechnut Nutrition Corp.* (1986) 185 Cal.App.3d 135, 141 [229 Cal.Rptr. 605].) We must therefore determine whether respondents owed Mr. Taylor a duty of care. The existence and scope of any such duty are legal questions for the court. (*Merrill v. Navegar, Inc., supra*, 26 Cal.4th at p. 477.) "Duty, being a question of law, is particularly amenable to resolution by summary judgment." (*Parsons, supra*, 15 Cal.4th at p. 465.)

When courts speak of duty in this sense, they refer to " 'the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' [Citation.]" (*Dillon v. Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912].) In *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561] (*Rowland*), our Supreme Court laid out the principal factors we must weigh in determining the existence of a duty, including (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered injury, (3) the closeness of the connection between the defendant's conduct and the injury suffered, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and (7) the availability, cost, and prevalence of insurance for the risk involved. (*Id.* at p. 113; accord, *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213 [63 Cal.Rptr.3d 99, 162 P.3d 610].) More recently, our high court has stated that the social utility of the defendant's conduct is also a relevant factor in determining the existence of legal duty. (*Parsons, supra*, 15 Cal.4th at pp. 473–476.) While Mrs. Taylor has not framed her argument in terms of these factors, we must nevertheless consider them on our own. Our examination of the *Rowland* factors leads us to conclude that respondents owed Mr. Taylor no duty of care.

■ Mrs. Taylor places great emphasis on foreseeability, arguing that respondents knew asbestos-containing gaskets, packing, and insulation would be used with their equipment. While important, "foreseeability alone is not sufficient to create an independent tort duty." (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 552 [87 Cal.Rptr.2d 886, 981 P.2d 978].) "[F]oreseeability is not synonymous with duty; nor is it a substitute." (*Ibid.*) Instead, whether a defendant may be held to owe a duty of care depends not only upon the

foreseeability of the risk, but also upon a weighing of the policy considerations that militate for and against imposition of liability. (*Ibid.*) Even if an injury is foreseeable, "policy considerations may dictate a cause of action should not be sanctioned no matter how foreseeable the risk." (*Elden v. Sheldon* (1988) 46 Cal.3d 267, 274 [250 Cal.Rptr. 254, 758 P.2d 582], fn. omitted; see also *Thing v. La Chusa* (1989) 48 Cal.3d 644, 668 [257 Cal.Rptr. 865, 771 P.2d 814] ["there are clear judicial days on which a court can foresee forever and thus determine liability but none on which that foresight alone provides a socially and judicially acceptable limit on recovery of damages for that injury"].) Moreover, in determining the existence of duty, our task "is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 572–573, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].)

Mrs. Taylor improperly focuses her foreseeability argument on the fact that respondents contemplated the use of asbestos-containing insulation, packing, and gaskets with their equipment. This represents an overly narrow view of foreseeability. What must be foreseeable is *the harm to the plaintiff*, not the mere fact asbestos-containing materials would be used with respondents' equipment. (See *Ballard v. Uribe, supra,* 41 Cal.3d at pp. 572–573, fn. 6.) Thus, the question is whether, in the early 1940's, respondents could reasonably foresee that (1) asbestos-containing materials supplied by other manufacturers would still be in use more than 20 years after the sale of their products, (2) asbestos fibers would be released from these materials during maintenance of the Hornet's propulsion system, (3) Mr. Taylor would inhale these fibers, and (4) exposure to the asbestos fibers would give rise to a latent disease that would only manifest itself decades after the exposure occurred. Stated more generally, can a manufacturer reasonably be expected to foresee the risk of latent disease arising from products supplied by others that may be used with the manufacturer's product years or decades after the product leaves the manufacturer's control? So viewed, the foreseeability of harm arising from an alleged failure to warn becomes considerably less certain. But even assuming that the risk is a foreseeable one, other policy considerations weigh against recognition of a duty in these circumstances.

Although there can be no question that Mr. Taylor suffered harm, the connection between respondents' conduct and Mr. Taylor's injury is remote. Respondents sold equipment to the Navy in the early 1940's, and it is undisputed that they were not the manufacturers or suppliers of the injury-causing products that Mr. Taylor encountered during his military service some 20 years later. Respondents' allegedly culpable conduct is the failure to warn of a danger arising from *other* manufacturers' products *two decades* after

respondents delivered their products to the Navy. Any connection between respondents' conduct and Mr. Taylor's injury is thus highly attenuated.

Little moral blame can be attached to the conduct for which Mrs. Taylor seeks to impose liability. Respondents did not warn of the dangerous properties inherent in other manufacturers' products. Given that to this day California law does not impose strict liability for the failure to warn of defects in the products of another manufacturer, it is difficult to view respondents' conduct as morally blameworthy. If Mr. Taylor's injuries may be ascribed to morally blameworthy conduct, it is the conduct of the manufacturers and suppliers of the asbestos-containing materials he actually encountered, who were in the best position to investigate and warn of the dangers posed by their products. (Cf. *Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409, 1418 [37 Cal.Rptr.2d 902] ["it serves no justice to fashion rules which allow responsible parties to escape liability while demanding others to compensate a loss they did not create"].)

Nor will imposing liability on respondents serve the policy of preventing future harm. It is doubtful respondents had any ability to control the types of products that were used with their equipment so long after it was sold. They delivered various parts to the Navy during World War II and had no control over the materials the Navy used with their products 20 years later when Mr. Taylor was exposed to asbestos. (See *Romito v. Red Plastic Co.* (1995) 38 Cal.App.4th 59, 66–67 [44 Cal.Rptr.2d 834] [skylight manufacturer owed no duty to electrician killed by falling through skylight three years after sale of product; ability to prevent future harm limited by lack of control over external factors affecting risk of harm].) Indeed, imposing a duty to warn on respondents now will do nothing to prevent the type of injury before us—latent asbestos-related disease resulting from exposure four decades ago. Such exposures have already taken place, and in light of the heavily regulated nature of asbestos today,[14] it is most unlikely that holding respondents liable for failing to warn of the danger posed by other manufacturers' products will do anything to prevent future asbestos-related injuries.

Imposing a duty in these circumstances would also impose significant burdens on defendants generally. Adopting the rule Mrs. Taylor advocates would extend potential liability for failure to warn to persons far outside of the distribution chain of the defective product. Defendants whose products

---

[14] Asbestos is subject to strict regulation under both federal and California law. (See *U.S. v. Weintraub* (2d Cir. 2001) 273 F.3d 139, 149–150 [partial listing of federal asbestos regulations]; see also Health & Saf. Code, § 25915 et seq. [notification requirements concerning presence of asbestos in buildings constructed after 1979]; Lab. Code, § 6501.9 [requiring determination of presence of asbestos before asbestos-related construction work is done]; Cal. Code Regs., tit. 8, § 1529 [regulation of asbestos in construction work].)

happen to be used in conjunction with defective products made or supplied by others could incur liability not only for their own products, but also for every other product with which their product might foreseeably be used.[15] The policy considerations that militate against imposition of strict liability in this situation apply with equal force in the context of negligence. (See *Peterson, supra,* 10 Cal.4th at pp. 1198–1200, 1209–1210 [noting that entities outside chain of distribution cannot exert pressure on manufacturer of defective product to make product safe and lack technical expertise in regarding the design of other manufacturers' products].)

Mrs. Taylor has not addressed whether respondents would be able to obtain insurance against the type of liability she proposes. Because it may often be difficult for a manufacturer to know what kind of other products will be used or combined with its own product, respondents might well face the dilemma of trying to insure against "unknowable risks and hazards." (*Anderson, supra,* 53 Cal.3d at pp. 1003–1004, fn. 14 [noting the problem of obtaining insurance for such risks].) Moreover, the California Supreme Court has hesitated to approve new theories of liability even when insurance is available where "[t]he value of such insurance . . . is unknown and difficult to determine . . . ." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 299 [253 Cal.Rptr. 97, 763 P.2d 948].) We conclude that this factor also weighs against imposition of liability.

Finally, there can be no doubt in this case that respondents' conduct was of high social utility. Respondents provided parts essential to powering an aircraft carrier that was used to defend the United States during the greatest armed conflict of the 20th century. If "garbage collection . . . is a vital public service and a matter of high social utility" (*Parsons, supra,* 15 Cal.4th at p. 474), then surely supporting the defense of the nation in time of war is even more so.

In sum, our consideration of the *Rowland, supra,* 69 Cal.2d 108, factors leads us to conclude that respondents owed Mr. Taylor no duty of care under the facts of this case. It necessarily follows that Mrs. Taylor can state no cause of action in negligence.[16]

---

[15] The court in *Deep Vein* offered an example to illustrate this problem: "[I]f a customer buys a car from a manufacturer that does not manufacture or install bicycle roof racks, is the car manufacturer under a duty to (1) warn the customer of all potentially defective brands of roof racks and (2) suggest which brands of roof racks it believes are the safest? If the manufacturer doesn't 'warn and suggest,' is it liable for damage caused by a defective roof rack purchased by the customer?" (*Deep Vein, supra,* 356 F.Supp.2d at p. 1068.)

[16] Our conclusion on the failure to warn causes of action also disposes of Mrs. Taylor's separate claim for loss of consortium, because that claim is derivative of those based on the alleged failure to warn. (E.g., *Davis v. Consolidated Freightways* (1994) 29 Cal.App.4th 354, 358, fn. 1 [34 Cal.Rptr.2d 438].)

## DISPOSITION

The judgments are affirmed. Respondents shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

Simons, Acting P. J., and Needham, J., concurred.

A petition for a rehearing was denied March 27, 2009, and appellant's petition for review by the Supreme Court was denied June 10, 2009, S171931.