Filed 2/2/17; part. pub. order 3/2/17 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| BILLY S. JOHNSON,<br><br>       Plaintiff and Appellant,<br><br>v.<br><br>ARVINMERITOR et al.,<br><br>       Defendants and Respondents. | A131975<br><br>(San Francisco City and County<br>Super. Ct. No. CGC-10-275528) |

Billy Johnson sued a number of automotive parts manufacturers for injuries alleged to have been caused by secondary exposure to asbestos or asbestos-containing materials.  Johnson alleged he suffered this exposure from asbestos contamination brought into his home by his father, a mechanic, and from asbestos released from the mechanical components during times he visited his father at work.  The defendant manufacturers moved for summary judgment, arguing Johnson did not have and could not obtain evidence that he or his father were exposed to asbestos from their products. The trial court granted summary judgment and we affirm.

## I.    BACKGROUND

In 2010, Johnson filed a personal injury complaint against multiple defendants, including the respondents here:  ArvinMeritor, Inc. (ArvinMeritor), individually and as successor-in-interest to Rockwell Standard (Rockwell); Maremont Corporation (Maremont); and Motion Control Industries, Inc., doing business in California as Carlisle Motion Control Industries, Inc. (Carlisle) (collectively, Defendants).  As relevant here, Johnson alleged his father (Father) was exposed to asbestos from Defendants' products

1

when he repaired brake and clutch assemblies while employed by Bekins Van and Storage, Inc. (also known as Bekins Van Lines, LLC and Pacific Storage Company; hereafter Bekins). Johnson was secondarily (para-occupationally) exposed to the same asbestos when he visited Father at work and when Father inadvertently carried asbestos to the family home or vehicle after work.[1] As a result of this asbestos exposure, Johnson suffered from or had an increased risk of contracting serious injuries, including mesothelioma. He brought causes of action for negligence, breach of implied warranty, strict products liability based on design and manufacturing defect, fraud and failure to warn, and conspiracy to defraud and failure to warn.

Defendants filed separate motions for summary judgment each arguing that Johnson did not have, and could not obtain, evidence to prove his claims. The following evidence was produced in support of and in opposition to summary judgment.

Father worked at the Bekins main warehouse in Stockton from June 1974 until May 1982. At Bekins, Father repaired and replaced brakes, clutches and engine gaskets on "unibody" or "bobtail" trucks and 18-wheel trucks. When removing brakes, Father used compressed air to blow brake dust out of brake drums and assemblies and clutch assemblies, which created visible dust in the air. When installing new brakes, Father would sometimes sand or grind the replacement brake parts, which also generated dust. From 1972 to 1982 "once a week or so," Johnson visited Father while Father was working on trucks at Bekins. He sometimes helped Father with brake and clutch work, and he sometimes swept up dust that was generated by this work. Father also wore his dusty clothes home from work, where the work clothes were washed with the family laundry.

A document produced by Bekins (Schedule A) identified six specific trucks owned by Bekins during the years of Father's employment: two Ford Motor Company (Ford)

---

[1] Our Supreme Court recently held, "Where it is reasonably foreseeable that workers, their clothing, or personal effects will act as vectors carrying asbestos from the premises to household members, employers have a duty to take reasonable care to prevent this means of transmission." (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1140.)

bobtail trucks (1965 and 1969 models) and four medium-duty International Harvester Company (International) semi-truck tractors (1965, 1969, 1971 and 1975 models). The summary judgment proceedings centered on whether Johnson had or could obtain sufficient evidence that Defendants' asbestos-containing products were in these trucks when Father performed brake work on the trucks, either as original equipment when the trucks were first manufactured (OEM) or as after-market replacement parts during brake repair jobs.

The original moving and opposition papers cited the following product identification evidence. Rockwell (ArvinMeritor's predecessor) supplied rear axles with asbestos-containing brake assemblies for all six trucks on Schedule A. During the years Father worked at Bekins, Rockwell also supplied asbestos-containing parts to International. Liberally construed, Johnson's evidence showed these parts included replacement parts. Carlisle was one of three or four suppliers of asbestos-containing brake linings to Rockwell from 1979 through 1981. Maremont, a wholly owned entity of ArvinMeritor, manufactured asbestos-containing brake linings under the Grizzly brand that were primarily intended to be used as replacement parts. Maremont supplied Grizzly friction materials to International. Johnson recalled that Father used International brand replacement parts when working on Bekins trucks.[2] Johnson had no personal knowledge that he or Father were exposed to asbestos from Defendants' products. The potential product identification witnesses named by Johnson either could not be located or had no knowledge that Johnson or Father were exposed to asbestos from Defendants' products.

During the summary judgment proceedings, Johnson was granted a continuance to search a newly-disclosed source of Navistar, Inc. (successor to International) documents

---

[2] Johnson's initial deposition testimony on this point was far from clear; he recalled Father going to a Bendix warehouse to get Bendix replacement parts for International trucks and removing Bendix equipment from an International truck. However, Johnson later declared unequivocally that, with his recollection refreshed, he recalled that Father used International brand replacement items on the International trucks. We liberally construe Johnson's original deposition testimony to be consistent with his later declaration.

(Repository Documents) that potentially could identify the manufacturers of the OEM and replacement parts in the Bekins International trucks. Johnson filed supplemental oppositions. He claimed he obtained evidence confirming that Rockwell brake assemblies were OEM in all four Bekins International trucks, and disclosing that Carlisle brake linings were OEM in three of the trucks and the only source of International brand-name replacement brake linings for those three trucks. Johnson's supplemental oppositions relied heavily on a declaration by Albert J. Ferrari, a mechanical engineer who based his opinion on the Repository Documents and other evidence. In supplemental replies, Defendants challenged the admissibility of Ferrari's declaration and other of Johnson's evidence, and argued Johnson's evidence was insufficient to prove a probability of exposure to asbestos from Defendants' products in the Bekins trucks.

During argument on the motions, the trial court distinguished between evidence of exposure to asbestos from OEM and replacement parts. To establish exposure from OEM parts, Johnson needed evidence that Defendants' products were original equipment on one or more Bekins trucks as well as evidence that Father performed the first brake job on those trucks (i.e., that the original parts were still on the vehicle at the time of Father's work). Argument on this issue focused on whether declarations by Johnson and by a Bekins driver, Robert Tennies, supported an inference that Father performed the first brake job on the Bekins 1975 International truck. To establish exposure to asbestos from Defendant-supplied replacement products, Johnson was required to show that Defendants supplied the replacement parts Father used to perform a brake job on any of the trucks. Argument on this issue focused on whether Ferrari was a qualified expert and whether certain Repository Documents that did not directly pertain to the four Bekins International trucks (Exhibits Q and S to Ferrari's declaration) nevertheless indirectly established that Carlisle was the sole supplier of International-brand replacement brake linings for those trucks.

The trial court granted summary judgment to all three Defendants. The court held each Defendant met its initial burden of production and Johnson failed to present admissible evidence raising a triable issue of fact regarding any of his claims. In the

4

ArvinMeritor order, the court ruled, "There is insufficient evidence for a reasonable trier of fact to draw a reasonable inference that [Father] did the first brake job on any of the [Bekins] trucks at issue in this matter." In all three orders, the court sustained the Defendants' "objections to the opinion[] of Mr. Albert J. Ferrari . . . on the grounds of speculation and lack of foundation. The lack of any connection between the [Repository Documents] relied on for these opinions, and the International Harvester trucks identified in 'Schedule A', renders the opinion[] . . . inadmissible."[3]

## II.    DISCUSSION

Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)[4] "[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law. . . . There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, fns. omitted.) In ruling on the motion, the court must draw all reasonable inferences from the evidence in the light most favorable to the opposing party. (*Id.* at p. 843.) An order granting summary judgment is reviewed de novo. (*Id.* at p. 860.)

"A defendant or cross-defendant has met his or her burden of showing that a cause of action has no merit if the party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete

---

[3] The trial court specifically sustained Defendants' objections to Ferrari's opinion "that [Johnson and Father] were exposed to [OEM] and replacement asbestos-containing brakes on any of the four International Harvester trucks in issue." In fact, Ferrari did not express an opinion on Johnson's or Father's exposure to asbestos from Defendants' products. Johnson complains about this "egregious" error in the trial court's rulings, but the misstatement does not undermine the soundness of the rulings and is not directly pertinent to any issues argued on appeal.

[4] Undesignated statutory references are to the Code of Civil Procedure.

5

defense to the cause of action." (§ 437c, subd. (p)(2).) To show a cause of action cannot be established, a moving defendant may either conclusively negate an element of the claim, or show "the plaintiff does not possess, and cannot reasonably obtain, needed evidence." (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 855.) "[A] defendant moving for summary judgment [must] present evidence, and not simply point out that the plaintiff does not possess, and cannot reasonably obtain, needed evidence. ( . . . § 437c, subd. (b).)" (*Aguilar*, at p. 854, fn. omitted.)

" 'Our review of the summary judgment motion requires that we apply the same three-step process required of the trial court. [Citation.] "First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond by establishing a complete defense or otherwise showing there is no factual basis for relief on any theory reasonably contemplated by the opponent's pleading. [Citations.] [¶] Secondly, we determine whether the moving party's showing has established facts which . . . justify a judgment in movant's favor. [Citations.] . . . [¶] . . . [T]he third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue." ' " (*Eriksson v. Nunnink* (2011) 191 Cal.App.4th 826, 848.)

A.      *Legal Standards in Asbestos Exposure Cases*

"In the context of a cause of action for asbestos-related latent injuries, the plaintiff must first establish some threshold *exposure* to the defendant's defective asbestos-containing products, and must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a *substantial factor* in bringing about the injury. In an asbestos-related cancer case, the plaintiff need *not* prove that fibers from the defendant's product were the ones, or among the ones, that actually began the process of malignant cellular growth. Instead, the plaintiff may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that in reasonable medical probability it contributed to the plaintiff's or decedent's *risk* of developing cancer." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 982–983 (*Rutherford*), fn. omitted.) Factors relevant to the substantial factor analysis may include "the length, frequency, proximity

6

and intensity of exposure, the peculiar properties of the individual product, any other potential causes to which the disease could be attributed (e.g., other asbestos products, cigarette smoking), and perhaps other factors affecting the assessment of comparative risk." (*Id.* at p. 975.)

The *Rutherford* court declined to "endorse any one particular standard for establishing the requisite *exposure* to a defendant's asbestos products . . . ." (*Rutherford, supra,* 16 Cal.4th at p. 982, fn. 12.) In his opening brief, Johnson argues that Defendants erroneously contend Johnson must prove his exposure with certainty. However, ArvinMeritor and Maremont expressly argue in their joint respondent's brief that Johnson must only "produce evidence showing it is *more likely than not* that [Father] worked on either (1) the originally-supplied brake linings . . . or (2) replacement brake linings" supplied by Defendants. That is, they expressly concede that the preponderance of evidence standard urged by Johnson is applicable. Carlisle does not contend otherwise.

Johnson further contends the Defendants erroneously insist he needs to produce evidence of the factors relevant to whether a given exposure is a substantial factor in increasing the risk of cancer. In fact, Defendants disclaim any reliance on those factors. Instead, they rely solely on their showing that Johnson failed to produce sufficient evidence to prove *any* exposure by a preponderance of evidence. As Defendants correctly note, the trial court also expressly stated it would grant summary judgment, if at all, based on insufficient evidence of exposure, not based on the substantial factor test.

Although the ultimate jury question would be *Johnson's* exposure to asbestos from Defendants' products, Defendants argue there is not even sufficient evidence that *Father* was exposed to asbestos from their products. The arguments on appeal focus on Father's, rather than Johnson's, exposure. Nevertheless, we keep in mind the ultimate factual issue is Johnson's exposure.

B.      *Did Defendants Shift the Burden of Production to Johnson?*

Johnson devotes much of his appellate briefing to the argument that the trial court erred in ruling Defendants had met their initial burden on summary judgment. We agree with the trial court that Defendants satisfied their initial burden.

7

When moving for summary judgment based on a plaintiff's inability to prove his or her claims, a defendant may satisfy its initial burden by showing the plaintiff provided factually devoid responses to comprehensive defense interrogatories that asked for all known facts to support the plaintiff's claims. (*Ganoe v. Metalclad Insulation Corp.* (2014) 227 Cal.App.4th 1577, 1583 (*Ganoe*).) "Parties have a duty to respond to discovery requests 'as completely and straightforwardly as possible given the information available to them.' " (*Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 106.) Therefore, the court may infer from an absence of evidence identified in such interrogatory responses that a plaintiff cannot obtain the evidence. (See *id.* at pp. 106–107.)

In arguing Defendants could not meet their initial burden through reliance on factually devoid interrogatory responses, Johnson insists his responses were factually detailed. He contrasts his detailed factual recitations with the "boilerplate answers that restate . . . allegations, or simply provide laundry lists of people and/or documents" that were criticized in *Andrews v. Foster Wheeler LLC, supra,* 138 Cal.App.4th at page 107. However, the mere presence of factual detail does not help a plaintiff unless that that detail, if accepted as true, would be sufficient to prove by a preponderance of evidence the element that is challenged on summary judgment. Here, Defendants argue Johnson cannot prove by a preponderance of the evidence that he was exposed to asbestos from any of *Defendants'* products, and Johnson does not cite evidence supporting an inference that either he or Father more likely than not suffered exposure to asbestos from these products. Johnson's interrogatory responses alleged Rockwell brake assemblies in Bekins trucks utilized asbestos-containing brake linings, Rockwell sold asbestos-containing replacement brake linings under the truck manufacturers' brand names, and Father used manufacturer brand name replacement linings when he worked on the trucks. However, as we discuss *post,* evidence that Rockwell's OEM brake assemblies had asbestos-containing parts when they were first manufactured does not establish exposure absent evidence that Father performed the initial brake job on the trucks, and Johnson's discovery responses do not cite evidence that would establish even a likelihood that he

8

did. Further, evidence that Rockwell was *a* supplier of brand-name replacement linings does not establish exposure absent evidence that Rockwell more likely than not supplied the actual replacement linings that were used by Father. The responses also fail to cite evidence to show Rockwell did do so. By way of comparison, the responses to interrogatories in *Ganoe* "contained 'specific facts' showing that [the defendant] had exposed [the plaintiff] to asbestos *in 1974* by removing asbestos-containing insulation *in Department 132* of the Goodyear plant *while he was present*." (*Ganoe, supra,* 227 Cal.App.4th at p. 1584, italics added.)

We agree with the trial court that Johnson's interrogatory responses failed to identify evidence that would demonstrate he probably was exposed to asbestos from Defendants' products. Therefore, Defendants properly relied on the responses to shift the burden of production.

C. *Did the Court Err in Concluding There Were No Triable Issues of Fact?*

We next consider whether, in light of all of the evidence submitted in support of and in opposition to the summary judgment motions, there were triable issues of fact regarding Johnson's exposure to asbestos from Defendants' product.

1. *Original Equipment*

Because Father did not start working for Bekins until 1974, Johnson's evidence of exposure to asbestos from OEM products in the Ford and International trucks is limited to the newest truck, the 1975 International (all other trucks were three to nine years old in 1974). Assuming Defendants' products were OEM on the 1975 International truck,[5] was there sufficient evidence to establish that Father performed the first brake job on the truck and thus was likely exposed to asbestos from Defendants' OEM products? We find the evidence too speculative to allow Johnson to survive summary judgment on this theory. Johnson produced sufficient evidence that might support subsidiary findings necessary to prove the theory (e.g., that the truck was purchased new), but in its entirety his showing

---

[5] ArvinMeritor concedes for purposes of the summary judgment proceedings that this truck included asbestos-containing Rockwell brake parts as OEM. Carlisle expressly declines to make a similar concession.

requires too many inferential leaps, " 'creat[ing] only "a dwindling stream of probabilities that narrow into conjecture." ' " (*Andrews v. Foster Wheeler LLC, supra,* 138 Cal.App.4th at p. 112.)

Johnson argues the following evidence supports an inference that the 1975 International truck was purchased new by Bekins. Robert Tennies, a Bekins truck driver who was familiar with the trucks owned and operated by Bekins, declared that soon after he started working at Bekins in 1973, the company began buying "brand new" trucks to add to its fleet. "I specifically recall that [Bekins] bought and began using a brand new 1973 or 1974 International 'bobtail' type truck (because [Bekins] had a big celebration when that truck was bought). [¶] . . . I also specifically recall that in 1975, [Bekins] bought and started using a brand new 1975 International medium-duty tractor truck (which became [Bekins] Unit 428).[6] I remember this 1975 International truck was brand new because it was delivered to [Bekins] by the International dealership." Johnson submitted a supplemental declaration stating that, after he reviewed brochures for the four Bekins International trucks identified on Schedule A, his memory was refreshed and he had a "present, independent recollection" that he watched Father work on "*the new* International '1800' tractor-trailer truck . . . . [¶] . . . The International 1800 tractor-trailer truck really sticks out because it was the biggest one and *it still looked new* when my Dad was working on it." (Italics added.) Carlisle argues dealerships sell used as well as new trucks, Johnson provides no direct evidence of the mileage on the truck when it arrived at Bekins, and the italicized phrases in Johnson's declaration are vague. We assume for purposes of discussion, that while Carlisle's criticisms are valid, there was evidence that would allow at least a reasonable inference that the 1975 truck was new when acquired by Bekins.

More problematic is Johnson's evidence that Father likely performed the first brake job on the 1975 International truck, even assuming it was purchased new. Fernando Ruiz, Jr., who was deposed in this action as Bekins's person most

---

[6] Unit 428 is the Bekins 1975 International truck listed on Schedule A.

10

knowledgeable, testified that he was not aware of anyone other than Father working as a mechanic at the Bekins main warehouse in Stockton before 1982. However, Ruiz also testified that Father worked as a "helper" when he was first hired at Bekins in 1974 and did not become a mechanic until some unspecified later time. Ruiz further testified that the Bekins International trucks sometimes were brought to a dealership for service. Tennies declared that he drove the truck in 1975 and did not recall that the truck was taken elsewhere for a brake job in 1975. However, Johnson did not produce any evidence of the likely interval before an initial brake job would be required on the 1975 truck, and nothing ruled out the possibility that a dealership performed the first brake job. Johnson declared that after viewing the International truck brochures he had a "present, independent recollection that . . . [he] watched [Father] remove and replace brakes from . . . the new International '1800' tractor-trailer truck" and the truck "still looked new when [Father] was working on it." Again, however, Johnson's declaration is, at minimum, vague regarding how new was "new" and whether "working on it" involved changing the initial set of brakes. In sum, it cannot be assumed that Father necessarily performed the first brake job on the truck, even assuming the work was done in or around Stockton, and in or around the first year of the truck's ownership.

Defendants also cite evidence that casts doubt on whether the first brake job on this truck was necessarily performed in or around Stockton. One witness testified that, between 1977 and 1979, the 1975 International truck was driven throughout the western states and was away from Stockton about 60 percent of the time. Defendants argue the truck "therefore would presumably have required maintenance and repair work while it was on the road."

Finally, we cannot ignore the fact that the ultimate factual question before the jury would be whether Johnson himself was exposed to asbestos from Defendants' OEM products in the 1975 International truck. Even if the jury were able to conclude Father probably performed the first brake job on this truck, it would have to further find that Johnson was either present during *that* brake job and inhaled asbestos released during the job, or that the asbestos fibers released during that job made their way into Johnson's

lungs by way of the family home or car. Johnson's evidence supports an inference that these events were possible, but not that they were probable.

Johnson argues the evidence here is comparable to the evidence that defeated summary judgment in *Ganoe, supra,* 227 Cal.App.4th 1577. However, *Ganoe*'s summary of the evidence plainly illustrates fewer inferential leaps were required to prove the plaintiff's case: "[T]here was evidence [the defendant] performed insulation work on steam piping *at the Goodyear plant in 1974*, that the *only* construction work requiring the installation of insulation at the Goodyear plant in 1974 occurred *in Department 132* when a new Banbury machine and 'lay-down machine' were installed, that the installation of those machines also required the removal of old insulation, and that Ganoe worked in that department, *was present during the repair* of the steam lines' insulation and breathed in the resulting dust." (*Id.* at p. 1586, italics added.) Here, in contrast, Johnson has not produced evidence of the approximate date and location of the first brake job or evidence establishing Father's presence at that place and time.

In sum, Johnson did not raise a triable issue of fact regarding his exposure to asbestos from Defendants' OEM products in the Bekins trucks.

2.      *Replacement Parts*

Johnson makes three arguments regarding replacement parts. First, he argues— based on Ferrari's declaration—that all replacement brake linings for the Bekins International trucks were Carlisle brake linings. Second, he argues evidence that Defendants (Rockwell, Maremont and Carlisle) were *among* the suppliers of asbestos-containing products for replacement parts for the Bekins trucks was sufficient to support an inference that Father was probably exposed to asbestos from Defendants' products. Third, he argues ArvinMeritor has design defect liability arising from the asbestos in the replacement linings even if it did not supply those linings because Rockwell specified the use of asbestos-containing replacement linings. We address these theories in turn.

a.      *Carlisle as Exclusive Supplier of International Replacement Linings*

We accept for purposes of argument that, assuming Johnson can establish Carlisle was the exclusive supplier of International brand replacement brake linings for the Bekins

12

International trucks, he can also establish his exposure to asbestos from Carlisle's products.  We conclude that Johnson has not made the initial showing.

Johnson relies on Ferrari's declaration.  Ferrari in turn relied on "line setting tickets" and engineering drawings produced and identified in discovery.  James Shuman, who was deposed as the person most knowledgeable at Navistar (International), testified that certain line setting tickets and sales data book pages (brochures) related to the four specific International trucks owned by Bekins.  Thomas Nelson, a Navistar production manager associated with the truck division, in turn testified that certain engineering drawings corresponded to and were identified in the line setting tickets produced by Navistar, and testified that Navistar maintained a repository of drawings that was organized by part number.  Johnson's counsel then retrieved drawings from the repository that corresponded to part numbers on the line setting tickets for the four International trucks and related documents (the Respository Documents).

Ferrari opined that part numbers appearing on both the line setting ticket, and on the Rockwell engineering drawings related to the 1975 International truck, corresponded to Rockwell front and rear brake assemblies, thus confirming that these brake assemblies were on this particular truck.  Ferrari also reviewed a Rockwell brake specification drawing for the front brake assembly (Exhibit N) and opined that it "specified and required brake Lining Mix 'MMB-62' "  Another Rockwell "Shoe & Lining Assy" (Exhibit O) drawing "incorporate[d] and set[] forth [Rockwell's] own specification of brake lining suppliers for the brake assemblies listed.  The tabulated parts list on this . . . drawing specifie[d] that the brake lining mix identified as 'MMB-62' is supplied by [Carlisle]."[7]  Ferrari opined that Exhibits N and O "together ma[d]e clear that [Rockwell] specified [Carlisle] brake linings as its original-equipment manufacturer brake linings where there [*sic*] 'MMB-62' Linings Mix were required . . . ."  Ferrari then opined that International engineering drawings (Exhibit Q) "plainly specif[ied] that the only

---

[7] We grant Johnson's December 2, 2016 unopposed motion to augment the record with copies of Exhibits N, O, Q and S to Ferrari's declaration, which were missing from the originally-filed appellate record.  (Cal. Rules of Court, rule 8.155(a).)

Approved Source for [International] service brake linings designated as 'MMB-62' brake linings was [Carlisle]" and required that those linings be marked with the International "IH" logo. In sum, Ferrari opined that both the OEM brake linings and the "[International] service brake linings" (i.e., International-brand replacement brake linings) for the front brakes on the 1975 International truck were Carlisle brake linings. Based on similar reasoning and with specific reference to an Exhibit S, Ferrari further opined that Carlisle also was the exclusive supplier of International-brand replacement brake linings for the rear brakes on the 1975 International truck and for brakes on the 1969 and 1971 International trucks.[8]

Ferrari cited Exhibits Q and S as evidence that connected Carlisle to the lining mix specifications on the Rockwell drawings (MMB-62 and MM-262-E). However, as Carlisle argues, these exhibits are not drawings of brake linings for the specific International trucks or truck models owned by Bekins.[9] Rather, they are International

---

[8] Ferrari opined that the brake linings for the rear brakes on the 1975 International truck were Carlisle linings, and that the 1969 and 1971 International trucks came with Rockwell rear axle brake assemblies "that required and used [Carlisle] brake linings." (Ferrari did not connect Carlisle linings to the 1965 International truck, which had a brake assembly manufactured by Timken Detroit Axle Company, an ArvinMeritor predecessor.) Although Ferrari did not expressly aver in his declaration that Carlisle was the *exclusive* supplier of International-brand replacement linings for these axles (as he did with respect to the front brakes on the 1975 International truck), it can be liberally construed that he took that position in his later deposition testimony.

[9] Carlisle did not make this argument in its supplemental reply brief in the trial court. Moreover, Johnson correctly observes that the evidence Carlisle cites on appeal does not fully support the company's argument. However, the argument was vigorously pursued by Carlisle at the final summary judgment hearing and Johnson's counsel conceded during that hearing the critical fact underlying Carlisle's argument: Exhibits Q and S do not identify the brake linings that were OEM on the Bekins International trucks or authorized as replacement materials for those trucks. Indeed, the exhibits depict brakes that are not the same size as the brakes on the Bekins trucks. Instead, Ferrari relied on the exhibits simply to show a correlation between the lining mix specifications for the Bekins trucks and Carlisle. The trial court apparently agreed that Exhibits Q and S were insufficient evidence to support Ferrari's opinion that Carlisle was the exclusive supplier of replacement parts for the Bekins International trucks: the court rejected Ferrari's declaration because of the "lack of any connection between the [Repository

14

engineering drawings for different-size brake linings that identify Carlisle as an approved source of "service" International-brand replacement linings using the same lining mix specifications. From these exhibits, Ferrari infers that *all* International-brand replacement linings with those lining mixes were manufactured by Carlisle. The inference is not self-evident and Ferrari does not support the inference with an explanation grounded in his mechanical engineering expertise. Ferrari also does not claim to have any familiarity with the particular practices of International's engineering specification or procurement practices, which might provide an alternative foundation for the inference. We agree with the trial court that the connection between Exhibits Q and S and the Bekins International trucks was insufficient.

    b.  *Multiple Suppliers of International Replacement Parts*

  Johnson argues he presented "sufficient circumstantial evidence from which a reasonable inference could be drawn that [he]—at some point during that 10-year period [when Father worked at Bekins]—was exposed to at least *some* of the asbestos supplied by each defendant." The evidence on which Johnson relies is that Ford and International "*predominately* used Rockwell axles and asbestos-containing brake systems in the types of trucks that Father worked on during the relevant time period," that "Carlisle was *one* of only a few suppliers to Rockwell for both its original equipment brake linings . . . and in the brand name replacement brakes for the types of trucks [Father] worked on at Bekin," and that "Maremont was *one* of the suppliers of asbestos-containing brake linings for brand name International Harvester replacement brakes for those types of trucks during the relevant time period." (Italics added).

  To support this argument, Johnson relies heavily on a footnote in a recent Supreme Court opinion, *Webb v. Special Electric Company, Inc.* (2016) 63 Cal.4th 167, 193,

---

Drawings] relied on for these opinions, and the International Harvester trucks identified in 'Schedule A.' " We consider the Carlisle argument preserved based on this record of argument and decision.

footnote 12 (*Webb*).[10]  The main issue addressed in *Webb*—whether a supplier of

hazardous raw materials owed a duty to warn end users about the material's dangers—is

not relevant here.  (*Id.* at pp. 176–177.)  In a footnote, however, the court considered and

rejected a subsidiary argument that the evidence was insufficient to show Webb was

exposed to crocidolite asbestos supplied by Special Electric.  (*Id.* at p. 193, fn. 12.)

"Plaintiffs introduced evidence that Webb was exposed to dust from Johns-Manville

products containing trace amounts of crocidolite at roughly the same time Special

Electric was supplying crocidolite asbestos to Johns-Manville.[11]  While evidence of the

link could be stronger, it is nonetheless sufficient for the jury to have found that Special

Electric's asbestos was a substantial factor in causing Webb's mesothelioma.  (See

*Rutherford*[*, supra,*] 16 Cal.4th [at pp.] 976–977; *Sparks v. Owens-Illinois, Inc.* (1995)

32 Cal.App.4th 461, 476.)"  (*Webb*, at p. 193, fn. 12.)  From this, Johnson argues that

exposure may be established by a preponderance of the evidence simply by showing the

defendant was a supplier of asbestos or asbestos-containing parts to a manufacturer

---

[10] Johnson's reply brief was filed four and a half years after the respondents'
briefs.

[11] *Webb* provides the following background information about the exposure:
"During the 1970's, Special Electric Company, Inc. (Special Electric) brokered the sale
of crocidolite asbestos to Johns-Manville Corporation (Johns-Manville).  . . . [¶] Special
Electric arranged for the material to be shipped directly from a mining company in South
Africa to Johns-Manville plants. . . . [¶] Johns-Manville was the oldest and largest
manufacturer of asbestos-containing products in the country, maintaining plants across
the United States and overseas. . . . Founded in 1858, the company once had 30,000
employees.  Its numerous asbestos products included flooring, roofing, siding, cement,
and pipe insulation.  It also made an asbestos cement pipe known as Transite pipe. . . .
[¶] . . . [¶] Johns-Manville's Long Beach plant manufactured Transite pipe.  While the
formula did not call for crocidolite asbestos, trace amounts of it could be found in the
pipe because Johns-Manville recycled broken or damaged bits of other products during
manufacture.  Scraps could comprise up to 20 percent of the components, so long as the
asbestos fiber count was kept within a prescribed range. [¶] Johns-Manville sold Transite
pipe through various distributors, including Familian Pipe & Supply.  Familian, in turn,
sold the pipe to Pyramid Pipe & Supply Co., where plaintiff William B. Webb worked as
a warehouseman and truck driver.  Between 1969 and 1979, Webb handled the product as
part of his job.  About 10 times a year, he made deliveries to job sites.  The pipe left a
dusty residue when handled . . . ."  (*Webb, supra,* 63 Cal.4th at pp. 177–178.)

16

during the period when a plaintiff was exposed to the manufacturer's asbestos-containing product.

Johnson reads too much into the *Webb* footnote. The *Webb* Court resolved a substantial evidence issue on the facts of the case before it;[12] it did not announce a general legal principle to be applied in other cases. Nor is a general principle inferable from the court's legal citations in the passage, which relate to the substantial factor (reasonable medical probability) causation test, not the standard for establishing exposure to a defendant's product.[13]

We find clearer guidance in decisions squarely addressing the sufficiency of evidence of exposure in asbestos personal injury cases. Particularly instructive is *Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962 (*Izell*). The plaintiff ran a construction company from 1964 to 1994, and he regularly visited jobsites where his workers were mixing and sanding asbestos-containing joint compound and opening bags of gun plastic cement, activities that created visible dust that the plaintiff inhaled. (*Id.* at pp. 966–967.) He identified four brands of joint compound and two brands of gun plastic cement that were used by his workers. Defendant Union Carbide supplied asbestos to five of those manufacturers at various times from 1970 to 1978. (*Id.* at p. 967.) The court held that the evidence allowed only speculation with respect to exposure to Union Carbide-supplied asbestos from four of the manufacturers' products, but was sufficient to establish likely exposure to Union Carbide-supplied asbestos from a fifth manufacturer's product. (*Id.* at p. 970.) With respect to the first group of manufacturers, Union Carbide

---

[12] Further, because the sufficiency of evidence of exposure was only a peripheral issue in the case, the facts recited in the opinion might not have fully described the evidence in the record.

[13] The cited passage in *Rutherford* explains that plaintiffs need not identify the manufacturer of specific inhaled asbestos fibers that caused their cancer. (*Rutherford, supra,* 16 Cal.4th at pp. 976–977.) The cited passage in *Sparks v. Owens-Illinois, Inc.* has no apparent relevance: it first discusses evidence showing the dangerousness of an asbestos-containing product, thus supporting a duty to warn, and then discusses the medical probability standard. (*Sparks v. Owens-Illinois, Inc., supra,* 32 Cal.App.4th at p. 476.)

was either a minority supplier of asbestos or the percentage of asbestos supplied by Union Carbide was unknown. (*Id.* at p. 970–973.) The court rejected the plaintiff's argument that the jury nevertheless could reasonably infer that *at least some* of defendant's products containing Union Carbide asbestos made their way to at least one of the worksites where plaintiff inhaled asbestos dust. (*Id.* at p. 971.) The court held the evidence was sufficient only with respect to a manufacturer that *exclusively* used Union Carbide asbestos. (*Id.* at p. 973.) Significantly, the plaintiff also testified that this manufacturer's product was the second-most frequently used joint compound at plaintiff's worksites, and he specifically recalled inhaling dust from that product during the mid to late 1970's. (*Id.* at pp. 974–975.)

In sum, the *Izell* court found evidence of exposure where the defendant supplied all of the asbestos in a product the plaintiff encountered and insufficient where the defendant supplied a minority of the asbestos in the other products or the percentage of defendant's asbestos in those products were unknown. In the instant case, the percentage of replacement brake linings supplied by Defendants is unknown. To the extent the percentage can be inferred from the number of suppliers (a questionable proposition), the evidence shows that Defendants were among multiple suppliers and thus does not support an inference that Johnson probably encountered asbestos from Defendants' products.

Other leading cases on the sufficiency of evidence of asbestos exposure are consistent with *Izell, supra,* 231 Cal.App.4th 962. In *McGonnell v. Kaiser Gypsum Co.,* the plaintiff worked as a plumber and pipefitter at a hospital complex and might have been exposed to asbestos when he cut through walls to perform his job. (*McGonnell v. Kaiser Gypsum Co.* (2002) 98 Cal.App.4th 1098, 1101.) Based on invoices from 1972 showing the sale of defendant's joint compound that might have contained asbestos was intended for a project at the hospital complex, the court conceded "it is at least within the realm of possibility that [the plaintiff] encountered a wall with [defendant's] joint compound during his 24 years of employment at [the hospital]." (*Id.* at p. 1105.) However, the *McGonnell* court concluded mere possibility was insufficient. "The evidence must be of sufficient quality to allow the trier of fact to find the underlying fact

18

in favor of the party opposing the motion for summary judgment. [Citation.] All that exists in this case is speculation that at some time [the plaintiff] might have cut into a wall that might have contained [defendant's] joint compound that might have contained asbestos." (*Ibid.*; see *Collin v. CalPortland Co.* (2014) 228 Cal.App.4th 582, 592 ["[w]e do not draw inferences from thin air"; "a mere possibility . . . is not enough to create a triable issue of fact"]; *Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409, 1421 [the evidence "creates a dwindling stream of probabilities that narrow into conjecture"].)

Liberally construed, Johnson's evidence supports the inference that Rockwell, Maremont (Grizzly), and Carlisle supplied brake linings for International brand replacement brake parts and that Father used some International brand replacement parts when he repaired brakes on the Bekins International trucks. However, Johnson produced no evidence to support an inference that the replacement brake linings Father actually handled were probably supplied by one of the Defendants. He produced no evidence that one of the Defendants was the primary or majority supplier of linings for International brand replacement brake parts. He produced no evidence that Defendants were likely to be the suppliers of brake linings for replacement parts for the models of International trucks owned by Bekins. He produced no evidence that sellers of International brand replacement parts to Bekins's main warehouse in Stockton were more likely to carry replacement parts containing Defendants' products than replacement parts containing other suppliers' products. Absent this or similar evidence supporting an inference of *probability* that the replacement brake linings came from one of the Defendants, Johnson's evidence simply establishes the possibility that Father was exposed to asbestos from a Defendant's product. That is insufficient to defeat summary judgment.

        c.     *Design Defect Theory*

Finally, Johnson argues ArvinMeritor can be held liable on a design defect theory based on the fact that Rockwell OEM brake assemblies in the International trucks required use of asbestos-containing replacement brake linings, even assuming Rockwell

19

did not supply the replacement linings installed on the Bekins trucks. Defendants argue Johnson's design defect theory is legally untenable. We agree.

Preliminarily, ArvinMeritor and Maremont argue any design defect theory is forfeited because Johnson did not raise it in the trial court. We disagree. In his supplemental opposition brief, Johnson cited evidence that Rockwell required use of asbestos-containing brake linings, and argued ArvinMeritor was liable because Johnson was exposed to "asbestos from Rockwell's asbestos-containing products required to be used on and with" the Bekins International trucks. In response, ArvinMeritor argued that under *Taylor v. Elliot Turbomachinery Co., Inc.* (2009) 171 Cal.App.4th 564 a manufacturer was not liable for asbestos exposure resulting from replacement parts that were manufactured and sold by another company. Johnson disputed that *Taylor* swept so broadly. The issue was extensively debated at the summary judgment hearings, and the court said it would review the case before making a final decision. In these circumstances, we consider the argument preserved. (On similar grounds, we deem a defense argument preserved. See fn. 9 *ante*.) Moreover, Johnson's appellate argument is also premised largely on *O'Neil v. Crane Co.* (2012) 53 Cal.4th 335 (*O'Neil*), a case that was not decided until after the respondents' briefs were filed in this appeal. Obviously, arguments based on *O'Neil* could not have been made in the trial court. Finally, the argument presents a question of law that may be considered for the first time on appeal. (See *Ward v. Taggart* (1959) 51 Cal.2d 736, 742.)

We nevertheless agree with Defendants that Johnson cannot prevail against ArvinMeritor on his design defect theory.[14] *O'Neil* involved "the limits of a manufacturer's duty to prevent foreseeable harm related to its product . . . ." (*O'Neil, supra,* 53 Cal.4th at p. 342.) In *O'Neil*, the decedent was exposed to asbestos released

---

[14] *O'Neil* separately discusses and rejects the plaintiffs' failure-to-warn theory of strict products liability, holding that the "defendants had no duty to warn of risks arising from *other manufacturers'* products." (*O'Neil, supra,* 53 Cal.4th at p. 348.) We express no opinion about whether Rockwell might have failure-to-warn liability based on its specification of asbestos-containing brake linings, an issue not raised by Johnson on appeal.

from the gaskets and inner and outer insulation of valves and pumps that were part of a naval warship's steam propulsion system. (*Id.* at pp. 343–345.) His family members sued the valve and pump manufacturers even though the asbestos-containing gaskets and insulation originally incorporated in the pumps and valves had long since been replaced by other manufacturers' asbestos-containing products by the time of the decedent's exposure. (*Id.* at pp. 342, 344.) The plaintiffs argued that the defendants' products were defective because they included and were used in connection with asbestos-containing parts, and it was foreseeable that persons using the defendants' products would be exposed to asbestos released from replacement parts and products used in conjunction with the pumps and valves. (*Id.* at p. 342.) The Supreme Court rejected the argument. (*Ibid.*) The court held that the defendants were not strictly liable because "any design defect in *defendants' products* was not a legal cause of injury to O'Neil." (*Id.* at p. 348.) Although the internal gaskets and packing originally supplied with the defendants' products contained asbestos, none of these original parts remained at the time O'Neil was exposed to asbestos, many years later. (*Id.* at p. 349.) "Accordingly, even assuming the inclusion of asbestos makes a product defective, no defect inherent in defendants' pump and valve products caused O'Neil's disease." (*Id.* at p. 350.) The high court observed that, "[a]s alternative insulating materials became available, the Navy could have chosen to replace worn gaskets and seals in defendants' products with parts that did not contain asbestos. . . . [M]ere compatibility for use with [asbestos-containing] components is not enough to render them defective." (*Ibid.,* fn. omitted.)

As with the pumps and valves in *O'Neil*, the Rockwell axle and brake assemblies, as originally manufactured, incorporated asbestos-containing material (brake linings) supplied by a third party (Carlisle), and asbestos-containing replacement parts, whether made by Carlisle or others, were most likely used in aftermarket repairs. But nothing demonstrates that the assemblies were themselves defective, apart from the hazards presented by the third party components. As the Supreme Court stated in *O'Neil*, "[T]he reach of strict liability is not limitless. We have never held that strict liability extends to harm from entirely distinct products that the consumer can be expected to use with, or in,

21

the defendant's nondefective product. Instead, we have consistently adhered to the *Greenman* [*v. Yuba Power Products* (1963) 59 Cal.2d 57] formulation requiring proof that the plaintiff suffered injury caused by a defect in the defendant's own product." (*O'Neil, supra*, 53 Cal.4th at p. 348.)

The *O'Neil* court stated in a footnote that "[a] stronger argument for liability might be made in the case of a product that *required* the use of a defective part in order to operate. In such a case, the finished product would inevitably incorporate a defect. . . . [H]owever, the policy rationales against imposing liability on a manufacturer for a defective part it did not produce or supply would remain. [Citation.] These difficult questions are not presented in the case before us, and we express no opinion on their appropriate resolution." (*Id.* at p. 350, fn. 6.) Johnson suggests that this is the situation presented here.

Johnson's theory is that Rockwell's brake assemblies specified and required use of asbestos-containing brake linings. He premises his theory on the Repository Documents, which he claims "unequivocally establish that Rockwell designed the brake assemblies [on the Bekins International trucks] and *expressly specified that Carlisle's MMB-62* [*or MM-262-E*] *asbestos-containing brake linings* were required to be used when the brake linings had to be replaced." We have previously concluded the evidence does not demonstrate Carlisle was the exclusive supplier of International-brand replacement brake linings for the Bekins models of International trucks. The Repository Documents would, however, arguably support the inference that Rockwell specified a brake lining mix for replacement linings that was the same as the mix used by Carlisle, which included asbestos. That is, the evidence arguably supports the inference that Rockwell specified the use of asbestos-containing materials for both original and replacement brake linings for the brake assemblies in the Bekins International trucks. But the fact that Rockwell may have *specified* an original component and/or replacement brake lining which in turn contained asbestos does not mean that asbestos was part of the specification or that Rockwell *required* use of asbestos in its component parts. Nor does it lead to the conclusion, as Johnson further suggests, that "the Rockwell-designed braking systems

22

would not work properly without the use of the specified asbestos-containing brake linings," creating design defect liability "separate and apart from its initial liability for installing and selling the asbestos-containing Carlisle brake linings as original equipment."

As with the products in *O'Neil*, there is no evidence that the brake assemblies *required* asbestos-containing materials in order to function generally. (See *O'Neil, supra,* 53 Cal.4th at p. 343.) There is no evidence that any alternatives to asbestos-containing friction materials were even available for automotive use at the relevant times. There is no evidence that, as alternative friction materials became available, users of Rockwell's brake assemblies could not have chosen to replace the brake linings with parts that did not contain asbestos. In fact, the record suggests that, as vehicle manufacturers transitioned from use of asbestos-containing friction materials, this is exactly what occurred. There is no evidence Rockwell needed to redesign its brake assemblies to accommodate asbestos-free linings.

We share the Supreme Court's expressed concern about preventing an "unprecedented expansion of strict products liability" based on other manufacturers' asbestos-containing products. (*O'Neil, supra,* 53 Cal.4th at p. 342.) Were we to accept Johnson's argument, by logical extension every vehicle produced by any manufacturer during the period before nonasbestos friction materials became generally available would be considered a defective product simply by virtue of incorporation of, or specification of, asbestos-containing materials in third party component parts. As the Supreme Court stated, "the reach of strict liability is not limitless." (*Id*. at p. 348.) We decline Johnson's invitation to take this "unprecedented" step.

### III.   DISPOSITION

The judgment is affirmed. Johnson shall bear Defendants' costs on appeal.

_____

BRUINIERS, J.

WE CONCUR:

_____

SIMONS, Acting P. J.

_____

NEEDHAM, J.

A131975

**CERTIFIED FOR PARTIAL PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| BILLY S. JOHNSON,<br><br>     Plaintiff and Appellant,<br><br>v.<br><br>ARVINMERITOR et al.,<br><br>     Defendants and Respondents. | A131975<br><br>(San Francisco City and County<br>Super. Ct. No. CGC-10-275528)<br><br>**[ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION]** |

THE COURT:

The opinion in the above-entitled matter filed on February 2, 2017, was not certified for publication in the Official Reports. For good cause appearing, pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, the opinion is certified for publication with the exception of Parts II.B., II.C.1. and II.C.2.a.

Date_____            _____Acting P.J.

Superior Court of San Francisco City and County, No. CGC-10-275528, Harold E. Kahn, Judge.

The Arkin Law Firm, Sharon J. Arkin; Farrise Firm and Simona A. Farrise for Plaintiff and Appellant,

McKenna Long & Aldridge, William J. Sayers, Lisa L. Oberg, Christopher W. Wood, Michelle C. Jackson, E. Jacob Lubarsky, J. Alan Warfield; Dentons and Jules S. Zeman for Defendants and Respondents ArvinMeritor, Inc., and Maremont Corporation.

Gordon & Rees, Michael J. Pietrykowski and Don Willenburg for Defendant and Respondent Carlisle Corporation.